Samuel N. FRANCO, Appellant,

v.

**NATIONAL CAPITAL REVITALIZATION CORPORATION,** Appellee.

No. 06–CV–645.

District of Columbia Court of Appeals.

Argued April 12, 2007.
Decided July 12, 2007.

Ralph Werner, Washington, DC, for appellant.

Paul J. Kiernan, with whom Roxan A. Kerr and Lynn E. Calkins, Washington, DC, were on the brief, for appellee.

Before GLICKMAN and FISHER, Associate Judges, and KING, Senior Judge.

FISHER, Associate Judge:

In July 2005 appellee National Capital Revitalization Corporation ("NCRC"), an independent instrumentality of the District of Columbia, initiated condemnation proceedings against property owned by appellant Samuel Franco. Mr. Franco answered the complaint and raised seven defenses, asserting primarily that this taking was for a private use and that the declared public purpose for the condemnation was a pretext. Mr. Franco also asserted six counterclaims. NCRC moved to strike Mr. Franco's defenses and counterclaims under Civil Rule 12(f), and the Superior Court granted that motion. The court then granted NCRC's motion for immediate possession of the property. Mr. Franco appeals from the orders striking his defenses and granting immediate possession of the property to NCRC. (He does not challenge the decision striking his counterclaims.)

Although this is an eminent domain action, our analysis centers on proper application of Civil Rule 12(f). Concluding that the "pretext" defense raises an issue requiring proof, and cannot be stricken for insufficient pleading, we reverse and remand for further proceedings.

## I. Facts and Procedural History

Samuel Franco owns a store called Discount Mart, which is part of the Skyland Shopping Center located in the southeast quadrant of the District of Columbia at the junction of Alabama Avenue, Good Hope Road, and Naylor Road. The shopping center contains about thirty businesses, including a Murry's Steaks supermarket, a CVS pharmacy, an AutoZone auto-supply store, a United States Post Office annex, a Kentucky Fried Chicken restaurant, and other retail establishments.

In 1998 the Council of the District of Columbia created the National Capital Revitalization Corporation as an independent instrumentality charged with several public purposes, including "induc[ing] economic development and job creation by developing and updating a strategic economic development plan for the District; ... [and] removing slum and blight...." D.C.Code § 2–1219.02(b) (2001). To ac-

complish its public purposes, NCRC is authorized to acquire and assemble land and real property by exercising the power of eminent domain. *See* D.C.Code § 2–1219.19 (2001).

In October 2002, NCRC entered into a Joint Development Agreement ("JDA") with four private corporations (together referred to as the "Purchaser/Developer") to redevelop the Skyland Shopping Center along with five acres of adjoining undeveloped land that was privately-owned and residentially-zoned (the "Skyland Site"). NCRC agreed to make "commercially reasonable good faith efforts" to acquire the properties within the Skyland Site through purchase agreements or by exercising the power of eminent domain, if its use was approved by the Council. The Purchaser/Developer agreed to prepare a plan to redevelop the site into a "first-class, quality mixed-use retail center."

### A. Authorizing Legislation

On March 2, 2004, Bill B15–752 was introduced to approve NCRC's exercise of the power of eminent domain to acquire the Skyland Site. The draft bill included a finding that the component properties were "necessary and desirable for the public use," but it did not explain why the properties were "necessary" or to what "public use" they would be devoted. On April 28, 2004, the Council's Committee on Economic Development held a public hearing on the proposed legislation.

The Committee reported favorably on the Skyland bill on November 3, 2004, and the Council passed it on December 7, 2004. The version approved by the Council included a set of findings that were not in the bill on November 3. These included findings that: "[t]he Skyland Shopping Center is a blighting factor in the Hillcrest and nearby communities"; "[t]he Skyland Shopping Center is characterized by underused, neglected, and poorly maintained properties"; "[t]he fragmented and often absentee ownership of the properties has exacerbated [the shopping center's] problems by allowing individual owners to avoid responsibility for safety and the reduction of crime, trash, and other blighting factors"; and "[n]either the police nor the community have been able to secure the cooperation of the current owners to deal with the numerous problems at the site despite years of efforts." The Council also found that "[t]he assemblage of the properties comprising the Skyland Shopping Center and the construction of a new shopping center on the site ... will further many important public purposes," including removal of garbage and other unsanitary conditions, reduction of crime, reorganization of the site, provision of needed job opportunities and retail options for residents of the surrounding neighborhoods, revitalization of an economically distressed community, and expansion of the tax base of the District of Columbia. The Council did not hold any additional public hearings before adding these findings. Mayor Williams signed the bill on December 29, 2004, and the act became law after the Congressional review period ended on April 5, 2005.[1] NCRC acquired most of the properties contained in the Skyland Site through private negotiations and other condemnation actions.[2]

1. Mr. Franco notes that between May 4, 2004, and September 30, 2004, the Council passed two emergency measures and a temporary bill substantially identical to the Skyland act signed December 29, 2004. None of those emergency or temporary bills contained any of the findings that were belatedly inserted in the original Skyland bill, and the Council held no separate hearings regarding the emergency and temporary measures.

2. This is the first time our court has had occasion to address one of the Skyland condemnations. Nevertheless, the legislation has

## B. This Litigation

NCRC filed the complaint to condemn Mr. Franco's property on July 8, 2005. In his answer, Mr. Franco denied that the Skyland Site was blighted and denied that NCRC had submitted a carefully considered development plan designed to serve a public purpose. Mr. Franco also raised seven defenses, asserting most prominently that the proposed condemnation would violate the Fifth Amendment of the United States Constitution because "it would authorize the taking of [the] property for a private use and not for a public use or purpose." Franco alleged that the declared reason for the taking was pretextual and that the true purpose was to confer a private benefit on a particular private party. Additionally, Mr. Franco's answer included six counterclaims, the first entitled "Taking in Violation of the Takings Clause Public Use Provisions of the Fifth Amendment of the U.S. Constitution."

On December 7, 2005, NCRC moved under Civil Rule 12(f)[3] to strike the defenses and the counterclaims in Mr. Franco's answer. A few days later, NCRC moved for immediate possession of the property, arguing that because it had filed its Declaration of Taking with the Superior Court and had deposited its estimate of just compensation in the court registry, it had acquired title to the property pursuant to D.C.Code § 16–1314(b) (2001). Under the circumstances, NCRC urged that it be granted immediate possession of the property as authorized by D.C.Code § 16–1316.

The Superior Court concluded that Mr. Franco's defenses were "legally insufficient" and therefore granted NCRC's motion to strike them. The court also struck the counterclaims, concluding that they were prohibited by Civil Rule 71A (e).[4] It also granted NCRC's motion for immediate possession, explaining that "[s]ince [Mr. Franco's] defenses have been struck by virtue of this order, and title has vested in NCRC, it is appropriate to grant NCRC's Motion for Immediate Possession of the property. There is no principled reason not to do so."

## II. Jurisdiction

■■■ This court has jurisdiction to review the decision granting NCRC's motion

---

generated a great deal of litigation in the Superior Court and the federal courts. *See Rumber v. District of Columbia and NCRC,* 487 F.3d 941 (D.C.Cir.2007) (reversing dismissal of action seeking declaratory judgment that the Skyland legislation was unconstitutional and remanding for consideration of claim that it authorized taking of property without a valid public use); *Autozone Development Corp. v. District of Columbia,* 484 F.Supp.2d 24 (D.D.C.2007) (sale was not the equivalent of a condemnation so lessees were not entitled to any portion of the sale proceeds); *Franco v. District of Columbia,* 456 F.Supp.2d 35 (D.D.C.2006) (denying motion to alter or amend court's previous judgment that takings claim of the Franco lessees was not ripe for federal adjudication because lessees had not exhausted local procedures to challenge the condemnation); *Franco v. District of Columbia,* 422 F.Supp.2d 216 (D.D.C. 2006) (abstaining from deciding Mr. Franco's claims due to his ongoing litigation in District

of Columbia courts, and dismissing the Franco lessees' claims because they were not yet ripe). The various Superior Court decisions are not reported.

3. Civil Rule 12(f) states in part: "Upon motion made by a party ... or upon the Court's own initiative at any time, the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Super. Ct. Civ. R. 12(f).

4. Civil Rule 71A (e) provides, in relevant part: "If a defendant has any objection or defense to the taking of the property, the defendant shall serve an answer ... which ... state[s] all the defendant's objections and defenses to the taking of the property.... No other pleading or motion asserting any additional defense or objection shall be allowed." Super. Ct. Civ. R. 71A (e).

for immediate possession because it is an interlocutory order "changing or affecting the possession of property." D.C.Code § 11–721(a)(2)(C) (2001). *See generally Williams v. Dudley Trust Foundation,* 675 A.2d 45, 51 (D.C.1996). An order granting a motion to strike defenses ordinarily is not immediately appealable, however. *See Securities & Exchange Comm'n v. Blazon Corp.,* 609 F.2d 960, 964 (9th Cir.1979) (order striking affirmative defenses not appealable before entry of final judgment); *United States v. 687.30 Acres of Land, More or Less, in Dakota and Thurston Counties, State of Nebraska,* 451 F.2d 667, 670 (8th Cir.1971) (ruling striking answer and counterclaim in condemnation action was interlocutory and not appealable); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1381, at 431 & n. 51 (2004) ("an order striking a defense as insufficient is not appealable, unless it is part of a final judgment"); *cf. Moss v. W.S. Pratt Scientific Brake Service, Inc.,* 206 A.2d 403, 404 (D.C.1965) (order striking allegations from complaint not appealable); *Brown v. Randle & Garvin, Inc.,* 32 A.2d 104, 105 (D.C. 1943) (court has no jurisdiction to hear interlocutory appeal from order striking item from complaint). Nevertheless, in this case the court explicitly linked its grant of immediate possession to its previous decision to strike the defenses. We thus are unable meaningfully to review the order transferring possession without considering the predicate decision to strike Mr. Franco's defenses.

▪ "The exercise of pendent appellate jurisdiction is often suggested, occasionally tempting, but only rarely appropriate." *Price v. Socialist People's Libyan Arab Jamahiriya,* 363 U.S.App. D.C. 404, 411, 389 F.3d 192, 199 (2004). Although this court has recognized its authority to "exercise pendent appellate jurisdiction to re-

view an otherwise nonfinal, nonappealable issue," *District of Columbia v. Simpkins,* 720 A.2d 894, 899 (D.C.1998), we have thus far declined to do so. *See District of Columbia v. Pizzulli,* 917 A.2d 620, 629 (D.C.2007); *Simpkins,* 720 A.2d at 900 ("On the facts before us, pendent appellate jurisdiction is not available."); *Francis v. Recycling Solutions, Inc.,* 695 A.2d 63, 82 (D.C.1997) ("a Rule 11 analysis on this record meets none of the criteria that would justify our exercise of pendent appellate jurisdiction"). Moreover, following the Supreme Court's lead, *see Swint v. Chambers County Comm'n,* 514 U.S. 35, 49–51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), we have established stringent criteria for exercising such jurisdiction. *See Simpkins,* 720 A.2d at 900 ("[A]bsent the necessary overlap, where either the nonappealable or the appealable issue virtually determines the result of the other, pendent appellate jurisdiction will not be available."); *Francis,* 695 A.2d at 83 (same). "In the final balance, whether or not we have authority to exercise pendent appellate jurisdiction in this case, there is no question that we have discretion to decline to do so." *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 363 U.S.App. D.C. 87, 100, 376 F.3d 1123, 1136 (2004).

We conclude that this is one of those rare instances where it is appropriate for us to exercise pendent appellate jurisdiction. The order granting immediate possession is properly before us, and it is "inextricably intertwined with" the court's decision to strike Mr. Franco's defenses. *See Swint,* 514 U.S. at 51, 115 S.Ct. 1203. Indeed, "review of the [latter] decision [is] necessary to ensure meaningful review of the [former]." *Id. See Clinton v. Jones,* 520 U.S. 681, 707 n. 41, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (approving circuit court's exercise of pendent appellate jurisdiction on "inextricably intertwined" and "meaningful review" grounds); *Nat'l R.R. Passenger Corp. v. ExpressTrak, L.L.C.,*

356 U.S.App. D.C. 259, 265, 330 F.3d 523, 529 (2003) ("[B]ecause the arbitrability of the dispute is inextricably intertwined with other orders over which we have jurisdiction, and because we must finally resolve the arbitrability of the dispute in order to review those orders, we have pendent appellate jurisdiction to resolve the issue of arbitrability."). Moreover, the record on appeal is adequate for review. *See Francis*, 695 A.2d at 81. We therefore will review both orders.

## III. Standard of Review

■ The trial court did not weigh the facts, and it did not grant a motion for summary judgment. Nor did it strike matters deemed "redundant, immaterial, impertinent, or scandalous...." Super. Ct. Civ. R. 12(f). Therefore, our task is a limited one—to determine whether the trial court properly concluded that Mr. Franco had failed to plead a legally sufficient defense. We review that decision *de novo*. *Society of Lloyd's v. Siemon–Netto*, 372 U.S.App. D.C. 448, 453, 457 F.3d 94, 99 (2006) ("Because the district court struck the [affirmative defenses] and dismissed the [counterclaims] solely on grounds of legal insufficiency, we review those decisions de novo."); *see United States v. 416.81 Acres of Land*, 514 F.2d 627, 631 (7th Cir.1975) (circuit court applying the same standard as district court to determine whether defenses should be stricken).[5] The parties agree that we review the decision to grant immediate possession of condemned property for abuse of discre-

tion. *See* D.C.Code § 16–1316 (2001) ("the court *may* fix the time within which and the terms upon which the parties in possession shall be required to surrender possession to the [condemnor]") (emphasis added); *see also Commercial Station Post Office, Inc. v. United States*, 48 F.2d 183, 186 (8th Cir.1931) (holding that when legal obligation of the condemnor assures eventual compensation for property, granting immediate possession to condemnor "is within the wise discretion of the trial court ..., and should not be overturned, unless clearly exercised improperly.").

## IV. Striking Defenses

■ Courts disfavor motions to strike. *E.g., Sweeney v. American Registry of Pathology*, 287 F.Supp.2d 1, 5 (D.D.C.2003); *Nwachukwu v. Karl*, 216 F.R.D. 176, 178 (D.D.C.2003); WRIGHT & MILLER, *supra*, § 1380, at 394. Such motions are useful and appropriate tools "for weighing the legal implications to be drawn from uncontroverted facts." *United States v. 416.81 Acres of Land*, 514 F.2d at 631 (internal citation omitted). However, a motion to strike a defense as insufficient will be denied "if [the defense] fairly presents a question of law or fact which the court ought to hear." *Securities & Exchange Commission v. Gulf & Western Industries, Inc.*, 502 F.Supp. 343, 345 (D.D.C.1980) (internal quotation marks and citation omitted).[6] "In sum, a motion to strike will not be granted if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should

---

**5.** "Because Super. Ct. Civ. R. 12 is identical to its federal counterpart, FED.R.CIV.P. 12, we may look to court decisions interpreting the federal rule as persuasive authority in interpreting the local rule." *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419, 427 n. 5 (D.C.1996) (internal quotation marks and editing omitted).

**6.** The decision in *SEC v. Gulf & Western* includes an alternative formulation: "[b]efore this type of motion can be granted the Court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defenses succeed." 502 F.Supp. at 345 (internal quotation marks and citation omitted). However, the final clause of this test ("under no set of circum-

be determined on a hearing on the merits." WRIGHT & MILLER, *supra*, § 1381, at 427–28 (footnotes omitted). Applying these standards, we reverse the trial court's premature conclusion that Mr. Franco's first defense was completely foreclosed by the recent Supreme Court decision in *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). We affirm its decision to strike Franco's other defenses.[7]

## A. The Impact of *Kelo*

Mr. Franco's first defense alleged that the legislation authorizing NCRC to take

his property violated the Takings Clause of the Constitution because the actual purpose of the condemnation was to confer a private benefit on a private party (the Purchaser/Developer). He claimed that the asserted public purpose for the taking was pretextual. In its decision, the trial court stated:

> [T]he issue Franco raises, that private property cannot be taken for private use even if there is an overriding public purpose as determined by the legislature, is foreclosed by *Kelo*, in a situation like this, where the stated reason for the taking is the removal of slum and its

stances could the defenses succeed") is derived from the "no set of facts" language in *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), which described the standard for determining whether a complaint should be dismissed for failure to state a claim. The Supreme Court has recently disavowed this language from *Conley*. *See Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007) ("[A]fter puzzling the profession for 50 years, this famous observation has earned its retirement."). Being unable to foresee the spillover effect of *Twombly*, we have refrained from relying upon this mimicking formulation.

7. Mr. Franco raised seven defenses to the condemnation of his property, but he does not challenge the Superior Court's decision striking three of them, and his own filings show that the other three are insufficient as a matter of law. For example, Mr. Franco claims that the Council violated his due process rights when it added the list of legislative findings to the Skyland bill and then passed the bill without any additional notice or hearing. However, he did receive notice of the proposed legislation and he participated in the hearing held by the Council. Assuming he has due process rights in this context, he does not have a right to a new hearing every time the draft legislation is altered. *Cf. Murphy v. Montgomery County*, 267 Md. 224, 297 A.2d 249, 254–55 (1972) (property owners' due process right to a hearing on the legislature's assessment of costs for sidewalks and curbs added to their property was satisfied

when they were given the opportunity for one hearing; "[n]o second hearing was required." (emphasis omitted)). Moreover, neither D.C.Code § 1–204.04(c) ("The Council shall adopt and publish rules of procedures which shall include provisions for adequate public notification of intended actions of the Council.") nor Council Rule 422 required these procedures. Council Rule 422 only requires notice by publication before adoption of a bill or before a hearing. The Council's revision did not change the substance of the Skyland legislation; it simply added findings based on testimony at the April 28, 2004, hearing which Mr. Franco attended.

Another defense asserted that the condemnation violated D.C.Code § 16–1311, because Mr. Franco's land was not "needed" for any "authorized municipal use." On appeal, he acknowledges that the defense is "subsumed in and dependent upon the answer to ... whether the taking is for a public purpose." If any part of this defense is not redundant, it lacks a legal foundation. Once a public purpose for a taking is established, courts do not evaluate a legislature's decision regarding what land is necessary to achieve that purpose. *See, e.g., Kelo v. City of New London, Connecticut*, 545 U.S. at 489[, 125 S.Ct. 2655] ("Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." (quoting *Berman v. Parker*, 348 U.S. 26, 35–36, 75 S.Ct. 98, 99 L.Ed. 27 (1954))).

replacement by an economically developed area that will provide substantial benefits to the public. As mentioned above, that was the Council's purpose in enacting the authorizing legislation, and it should not be second-guessed here. The trial court did not undertake any factual inquiry to determine that the legislation had "an overriding public purpose" and "will provide substantial benefits to the public." Thus, its discussion suggests that, once the legislature has declared that there is a public purpose for a condemnation, an owner is foreclosed as a matter of law from demonstrating that the stated reason is a pretext. We do not interpret *Kelo* so broadly.

To be sure, the decision in *Kelo* emphasized that, apart from determining what compensation is just, courts play a limited role in condemnation cases. "Without exception, our cases have defined th[e] concept [of "public purpose"] broadly, reflecting our longstanding policy of deference to legislative judgments in this field." 545 U.S. at 480, 125 S.Ct. 2655. The Court was satisfied that its "public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." *Id.* at 483, 125 S.Ct. 2655. (Similarly, courts will not second-guess the legislature's "considered judgments about the efficacy of its development plan ... [or its] determinations as to what lands it needs to acquire in order to effectuate the project." *Id.* at 488–89, 125 S.Ct. 2655.)

Some questions have been settled. "Promoting economic development is a traditional and long accepted function of government.... Clearly, there is no basis for exempting economic development from our traditionally broad understanding of public purpose." *Id.* at 484–85, 125 S.Ct. 2655. Moreover, it is not a valid objection that private parties will benefit from the taking. "Quite simply, the government's pursuit of a public purpose will often benefit individual private parties." *Id.* at 485, 125 S.Ct. 2655. *See also id.* at 485 n. 14, 125 S.Ct. 2655 ("Any number of cases illustrate that the achievement of a public good often coincides with the immediate benefiting of private parties."); *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 243–44, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) ("The mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose.").

■ On the other hand, "it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation." *Kelo,* 545 U.S. at 477, 125 S.Ct. 2655. Thus, the *Kelo* majority reaffirmed that "the City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party." *Id. See Midkiff,* 467 U.S. at 245, 104 S.Ct. 2321 ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."). Importantly for this case, the Court added: "Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Kelo,* 545 U.S. at 478, 125 S.Ct. 2655. Finally, "the question [of] what is a public use is a judicial one." *City of Cincinnati v. Vester,* 281 U.S. 439, 446, 50 S.Ct. 360, 74 L.Ed. 950 (1930). *See Kelo,* 545 U.S. at 480, 125 S.Ct. 2655 ("The disposition of this case ... turns on the question whether the City's development plan serves a 'public purpose.'").

The *Kelo* Court did not address the sufficiency of the pleadings filed by the landowners. An extensive record had been developed during a seven-day bench trial, and the Court noted that "[t]he trial judge and all the members of the Supreme Court of Connecticut agreed that there was no evidence of an illegitimate purpose in this case." *Id.* Based on the record presented, the Court concluded that "the City's development plan was not adopted 'to benefit a particular class of identifiable individuals.'" *Id.* at 478, 125 S.Ct. 2655 (quoting *Midkiff,* 467 U.S. at 245, 104 S.Ct. 2321).

■■■ Although the Court determined that the taking at issue in *Kelo* was not pretextual, it emphasized, as we have noted, that a government would not "be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." *Kelo,* 545 U.S. at 478, 125 S.Ct. 2655.[8] Thus, *Kelo* recognized that there may be situations where a court should not take at face value what the legislature has said. The government will rarely acknowledge that it is acting for a forbidden reason, so a property owner must in some circumstances be allowed to allege and to demonstrate that the stated public purpose for the condemnation is pretextual. It may be difficult to make this showing, and the Supreme Court's decision may raise many more questions than it answers, but a pre-text defense is not necessarily "foreclosed by *Kelo.*"

## B. Did Appellant Adequately Plead a "Pretext" Defense?

■■■ Because such a defense is sometimes viable, we must evaluate whether Mr. Franco adequately pled a defense of pretext. All facts underlying the defense "must be taken to be those set up in the ... answer." *Kelly v. Kosuga,* 358 U.S. 516, 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). In considering a motion to strike defenses, a court draws all reasonable inferences in favor of the party asserting the defenses and resolves "all doubts in favor of denying the motion to strike." *Nwachukwu,* 216 F.R.D. at 178. A motion to strike will be denied "if [the defenses] fairly present[ ] a question of law or fact which the court ought to hear." *Securities & Exchange Commission v. Gulf & Western Industries, Inc.,* 502 F.Supp. at 345.

Applying these standards, we hold that Mr. Franco sufficiently pled his pretext defense. His answer alleges that the legislation authorizing NCRC to take his property

would authorize the taking of said property for a private use and not for a public use or purpose by, among other things, having as its purpose conferring a private benefit on a particular private party, stating pretextually a public purpose but having as its actual purpose bestowing a private benefit....

---

8. We apply the decision of the *Kelo* majority, written by Justice Stevens. Although Justice Kennedy's concurrence discusses at some length a court's role when presented with allegations of a pretextual public purpose, that discussion is not the holding of the court. Five justices, including Justice Kennedy, 545 U.S. at 470, 490, 125 S.Ct. 2655, agreed with Justice Stevens' reasoning, and that opinion is the Court's holding. *Cf. Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....'") (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Nevertheless, Justice Kennedy's concurring opinion may accurately predict what the Court will hold when the record before it does not resolve the pretext issue.

These allegations may be too conclusory by themselves to survive a motion to strike (a question we do not decide). *See* Super. Ct. Civ. R. 8(b) ("A party shall state in short and plain terms the party's defenses to each claim asserted ...."); *id.,* R. 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct."). *Cf. Twombly,* 127 S.Ct. at 1965 ("Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level...."). However, Franco made many specific factual allegations to support this claim, albeit presenting them under the subheading "First Counterclaim (Taking In Violation of the Takings Clause Public Use Provisions of the Fifth Amendment of the U.S. Constitution)." The trial court did not address these facts because it struck Mr. Franco's six counterclaims, holding that Superior Court Civil Rule 71A (e) prohibited it from considering them. *See Kansas Pipeline Co. v. A 200 Foot by 250 Foot Piece of Land, Located in Section 6, Southwest Quarter, Township 32 South, Range 10 West, County of Barber, State of Kansas,* 210 F.Supp.2d 1253, 1258 (D.Kan.2002) (according to Rule 71A (e), counterclaims are not permitted in the answer); 12 Charles Alan Wright, Arthur R. Miller and Richard L. Marcus, Federal Practice and Procedure: Civil 2d § 3048, at 216 (1997) (same).

Mr. Franco does not contest the decision to strike his counterclaims, as such, or the court's refusal to re-designate the counterclaims as *additional* defenses. *See* Rule 71A (e) (providing that after the answer has been filed, "[n]o other pleading or motion asserting any additional defense or objection shall be allowed"). However, he urged the trial court to recognize that the allegations in the counterclaims "provide addition[al] detail to the respective defenses in the answer," and we decline to ignore factual detail which elaborates on his defense that the proposed taking would violate the Fifth Amendment. *See* Super. Ct. Civ. R. 8(c) ("When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the Court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."); *Horsford v. Romeo,* 407 F.2d 1302, 1303 (3d·Cir.1969) ("[T]he court will treat a defendant's pleading denominated a counterclaim as an answer raising affirmative defenses, regardless of its title, if the allegations of the pleading so require.").[9]

Therefore, we consider facts alleged in his counterclaims which support Mr. Franco's defense of pretext (although we do not repeat all of those allegations in this opinion). In accordance with the standards discussed above, we assume these facts (as distinguished from his legal conclusions) are true and give Mr. Franco the benefit of reasonable inferences drawn from them. He alleges that NCRC entered into the JDA with a private developer in September 2002, two years before the first bill concerning the Skyland Site was intro-

**9.** *See also* Super. Ct. Civ. R. 8(f) ("All pleadings shall be so construed as to do substantial justice."); *United States v. 18.2 Acres of Land, More or Less, in Butte County, State of California,* 442 F.Supp. 800, 804 (E.D.Cal.1977) (refusing to hold that defendant had waived a defense because when he pled it he used improper terminology; "Rule 71A is not to be read in a vacuum, and the case law provides this court with sufficient justification to be liberal in its interpretation of defendant's answer"); *City of Davenport, Iowa v. Three–Fifths of an Acre of Land, More or Less, in City of Moline, Illinois,* 147 F.Supp. 794, 796 (S.D.Ill.1957) (in a condemnation proceeding where defendant filed a motion to dismiss but did not file an answer, the court considered the "motion to dismiss as an answer in order that the matter may be determined upon its merits rather than upon a strict construction of procedure").

duced to the Council. The JDA provided that NCRC would share in the profits of the redevelopment. Mr. Franco alleged that NCRC then set about to obtain the funds and legal authority to acquire the Skyland Site. "NCRC's sole objective in this intended acquisition [was] to perform its undertakings under the JDA" and then sell the property to the developer, who would "design and build a new shopping center on the site for his own account." He asserted that NCRC had refused to discuss redevelopment of the site with any of the present owners, "despite said owners' repeated requests." He also alleged that NCRC planned to sell the site to the private developer for $25 million less than its value.

Mr. Franco asserted that the stores in the Skyland Shopping Center had been "fully leased for at least the last five years," he named several of the tenants, and he denied that the center was either blighted or located in a blighted area. He also detailed the actions of the Council in proposing and voting on the four Skyland bills. Mr. Franco alleged that none of the bills specified any use for the properties or stated why the Council considered the properties "necessary and desirable for the public use." Finally, he alleged that the legislative findings inserted at the last minute "were and remain pretextual, wrong, inaccurate, baseless and substantially irrelevant." For example, the permanent legislation recites that NCRC had "advised the Council that the Skyland Shopping Center is blighted," but, according to Mr. Franco, NCRC admitted that it had made no such finding. He claimed that the Council revised the final Skyland bill to include this finding and fifteen others without giving public notice, conducting a public hearing, or giving owners, tenants, or interested members of the public an opportunity to contest the truth of these revisions.

Recognizing the limited role of the courts in eminent domain jurisprudence, we are especially careful not to indulge baseless, conclusory allegations that the legislature acted improperly. *Compare United States v. 416.81 Acres,* 514 F.2d at 631–32 (appellant's assertion that the purported public use was a pretense or a sham did not state a valid defense to the proposed taking; even accepting as true the factual underpinnings of his objections, the taking still would qualify as a public use) *to United States v. 58.16 Acres of Land, More or Less, in Clinton County, State of Illinois,* 478 F.2d 1055, 1057, 1059 (7th Cir.1973) (court could not summarily deny without a hearing a property owner's detailed objections; "questions of bad faith, arbitrariness, and capriciousness, all bearing upon the determination of public use, having been raised . . ., the district court was required to resolve those questions"). Furthermore, courts accord deference to a legislature's judgment that a taking will serve a public purpose. *E.g., Kelo,* 545 U.S. at 480, 125 S.Ct. 2655 ("Without exception, our cases . . . reflect[ ] our longstanding policy of deference to legislative judgments" as to what is a "public purpose"); *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954) ("when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."); *cf. Robert Siegel, Inc. v. District of Columbia,* 892 A.2d 387, 395 (D.C.2006) (declining to second-guess Council's legislative judgment that estimate of costs to acquire land and build infrastructure for major league baseball stadium was satisfactory).

Nevertheless, *Kelo* makes clear that there is room for a landowner to claim that the legislature's declaration of a public purpose is a pretext designed to mask a taking for private purposes, and we hold

that Mr. Franco adequately pled such a defense. With the detailed allegations included in his "counterclaims," the defense "fairly present[ed] a question of law or fact which the [trial] court ought to hear." *Securities & Exchange Commission v. Gulf & Western Industries, Inc.*, 502 F.Supp. at 345. *Cf. Twombly*, 127 S.Ct. at 1965 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." (internal quotation marks and citation omitted)). Therefore, we remand so that Mr. Franco's pretext defense can be evaluated on its merits.[10]

### C. Litigating the "Pretext" Defense

▮▮▮ Unfortunately, "the *Kelo* majority did not define the term 'mere pretext'...." *Goldstein v. Pataki*, 488 F.Supp.2d 254, 287 (E.D.N.Y.2007). *See Kelo*, 545 U.S. at 478, 125 S.Ct. 2655. However, as discussed above, see p. 168, we do know that promoting economic development is a valid public purpose and that it is not enough for the protesting landowner to demonstrate that private parties will benefit from the project. Furthermore, the government may rely on a private entity to implement its public purpose. *See id.* at 486, 125 S.Ct. 2655 (" 'The public end may be as well or better served through an agency of private enterprise than through a department of government ....' " (quoting *Berman*, 348 U.S. at 33–34, 75 S.Ct. 98)). On the other hand, the majority opinion in *Kelo* did suggest (with-

out deciding) that a transfer of property from one private party to another, "executed outside the confines of an integrated development plan, ... would certainly raise a suspicion that a private purpose was afoot...." 545 U.S. at 487, 125 S.Ct. 2655. And it certainly would be relevant if the government proposes a transfer to a private party, but "the projected economic benefits of the project [are] *de minimus.*" 545 U.S. at 493, 125 S.Ct. 2655 (Kennedy, J., concurring).

Some guidance may be provided by the Court's citation to *99 Cents Only Stores v. Lancaster Redevelopment Agency*, 237 F.Supp.2d 1123 (C.D.Cal.2001), *see* 545 U.S. at 487 n. 17, 125 S.Ct. 2655, where the plaintiff alleged that the city of Lancaster was planning to condemn its property in order to give additional space to Costco, an "anchor" tenant in a regional shopping center. The district court considered "whether Lancaster has presented a valid or [a] pretextual public use for its plan to condemn 99 Cents' leasehold interest." *99 Cents Only Stores*, 237 F.Supp.2d at 1129. Observing that "[n]o judicial deference [to the legislature] is required ... where the ostensible public use is demonstrably pretextual," *id.*, the court granted summary judgment in favor of the holder of the lease, concluding that "Lancaster's condemnation efforts violate the Public Use Clause of the Fifth Amendment." *Id.* at 1131. "[T]he evidence [was] clear beyond dispute that Lancaster's condemnation efforts rest on nothing more than the desire

---

10. Some courts have converted Rule 12(f) motions into motions for partial summary judgment. *See, e.g., Marco Holding Co. v. Lear Siegler, Inc.*, 606 F.Supp. 204, 213 (N.D.Ill.1985) (District Court treated Rule 12(f) motion as one for partial summary judgment when both parties submitted materials outside the pleadings and "the challenge [was] directed at the substance, rather than at the form of defendant's pleading."); *Ciprari v.*

*Servicos Aereos Cruzeiro do sul, S.A.*, 245 F.Supp. 819, 820 (S.D.N.Y.1965) (court treated Rule 12(f) motion as a motion for summary judgment "[s]ince there are some facts outside the pleadings which are stipulated or otherwise beyond dispute and which ought to be considered"). That did not happen here, and the case is not in a posture that allows us to treat the court's ruling as a grant of partial summary judgment.

to achieve the naked transfer of property from one private party to another." *Id.* at 1129. The district court rejected the city's argument that retaining Costco as a tenant *was* a public use because it would help prevent the "reestablishment of blight." *Id.* The court noted, among other things, that "there is simply no evidence in the record to suggest that so-called 'future blight' was the actual reason underlying Lancaster's condemnation efforts at the time they were initiated." *Id.* at 1130. "The idea of future blight simply embodies Lancaster's current litigation position; it is not supported by any evidence in the record." *Id.*

Although the Supreme Court has not clarified the meaning of "pretext," Justice Kennedy focused hypothetically on the insubstantial quality of touted public benefits, stating "that transfers intended to confer benefits on particular, favored private entities, and with only incidental or pretextual public benefits, are forbidden by the Public Use Clause." 545 U.S. at 490, 125 S.Ct. 2655. In this formulation the word "pretextual" is used to character-

ize the public benefits that will flow from the taking, not the thought processes of legislators or other government officials. Nevertheless, the same sentence refers to intent ("transfers intended to confer benefits"), presumably the intent of the legislators.

■ The terms "purpose," "motive," and "intent" sometimes are used (imprecisely) as if they were interchangeable. In the present context, it is important to remember that "public purpose" is the modern mode of expressing the constitutional requirement of a "public use." *See Kelo,* 545 U.S. at 480, 125 S.Ct. 2655 (the Supreme Court has "embraced the broader and more natural interpretation of public use as 'public purpose'"). Moreover, there are formidable barriers to discovering the motives [11] and intentions of individual legislators.[12]

We conclude that a reviewing court must focus primarily on benefits the public hopes to realize from the proposed taking.[13] If the property is being transferred

---

**11.** The United States Court of Appeals for this jurisdiction and its predecessor have long shied away from examining the motives of "local authorities" exercising the power of eminent domain. *See O'Hara v. District of Columbia,* 79 U.S.App. D.C. 302, 304, 147 F.2d 146, 148 (1944) (" 'It is for them to determine when a public improvement is necessary, and, so long as they do not exceed or abuse the power delegated to them, the courts are powerless to inquire into the motives which actuate them or the propriety of the contemplated improvement.' ") (quoting *MacFarland v. Elverson,* 32 App. D.C. 81, 86 (1908)). Some of the language in *Kelo* may suggest a different approach, but nothing in *Kelo* clearly overrules these local cases.

**12.** For example, legislators may not be deposed or made to answer interrogatories in an attempt to disclose their individual motivations. *See* D.C.Code § 1–301.42 (2001); *see also, e.g., Dorsey v. District of Columbia,* 917 A.2d 639, 642–43 (D.C.2007) (the District of

Columbia's legislative immunity statute, patterned after the speech or debate clause of the United States Constitution, "clothes D.C. City Council members with immunity from lawsuits ... for conduct undertaken in their legislative capacities." (quoting *Dominion Cogen, D.C., Inc. v. District of Columbia,* 878 F.Supp. 258, 262 (D.D.C.1995))); *Fields v. Office of Eddie Bernice Johnson,* 373 U.S.App. D.C. 32, 45, 459 F.3d 1, 14 (2006) (en banc) ("A Member [of Congress] may not be made to answer questions—in a deposition, on the witness stand, and so forth—regarding legislative activities." (internal quotation marks and citation omitted)), *appeal dismissed and cert. denied,* —— U.S. ——, 127 S.Ct. 2018, 167 L.Ed.2d 898 (2007).

**13.** *But see Kelo,* 545 U.S. at 487, 125 S.Ct. 2655 (rejecting argument that Court "should require a 'reasonable certainty' that the expected public benefits will actually accrue"). "Of course, this Act, like any other, may not be successful in achieving its intended goals.

to another private party, and the benefits to the public are only "incidental" or "pretextual," a "pretext" defense may well succeed. On the other hand, if the record discloses (in the words of the trial court) that the taking will serve "an overriding public purpose" and that the proposed development "will provide substantial benefits to the public," the courts must defer to the judgment of the legislature. Harder cases will lie between these extremes.

Other courts applying *Kelo* have inquired whether the record demonstrates a public purpose for the taking. *See Mayor and City Council of Baltimore City v. Valsamaki*, 397 Md. 222, 916 A.2d 324, 351–52 & n. 26 (2007) (invalidating quick-take condemnation designed to assist business expansion in the area because the city had presented "sparse" evidence of public use and had *"no plan* for the development of the Property"; court suggests that "in a regular condemnation proceeding" city would have presented more evidence to satisfy its "minimal burden of presenting a *prima facie* case as to public use/purpose."); *Rhode Island Economic Development Corporation v. The Parking Company, L.P.*, 892 A.2d 87, 104 (R.I.2006) (court concluded, "based on the record developed before us, [that] the principal purpose for the taking in this case was not a valid public use"). In the latter case, the Rhode Island Supreme Court noted that the taking could not possibly have served the purpose of "increased parking" asserted during litigation because "no additional parking spaces were created." 892 A.2d at 105. Furthermore, the taking would enable the Rhode Island Airport Corporation to avoid the terms of its pre-existing contract with the property owner and would result in a "multi-million dollar windfall" to the Corporation. *Id.* at 104–06. In a subsequent order the Supreme Court of Rhode Island characterized its opinion as "conclud[ing] that condemnation was a ruse by which Rhode Island Airport Corporation (RIAC) could avoid the contract between the parties...." *Rhode Island Economic Development Corp. v. The Parking Company, L.P.*, 909 A.2d 943 (R.I. 2006). *See also MHC Financing Ltd. P'ship v. City of San Rafael*, 2006 WL 3507937, at *14 (N.D.Cal. Dec.5, 2006) (denying city's motion for summary judgment; inquiry into claim of pretext was necessary). *Cf. Goldstein v. Pataki*, 488 F.Supp.2d 254, 288–91 (E.D.N.Y.2007) (conclusory allegations were not sufficient to state a "pretext" claim; plaintiffs "concede[d] that the Project will create large quantities of housing and office space, as well as a sports arena, in an area that is mostly blighted"; they did "not allege any facts suggesting that any Defendant had any reason to bestow a benefit on any private party").

Explaining why it was satisfied that there was no illegitimate purpose in *Kelo*, the Supreme Court emphasized several factors revealed by the record in that case. Although the affected area of New London, Connecticut, was not blighted, the government's "determination that the area was sufficiently distressed to justify a program of economic rejuvenation [was] entitled to ... deference." 545 U.S. at 483, 125 S.Ct. 2655. It was reassuring that the identities of the private parties who would benefit "were not known when the plan was adopted." 545 U.S. at 478 n. 6, 125 S.Ct. 2655. Moreover, the takings were to be executed pursuant to a "comprehensive" development plan, and "thorough de-

---

But whether in fact the provision will accomplish its objectives is not the question: the constitutional requirement is satisfied if the state Legislature rationally could have believed that the Act would promote its objective." *Midkiff*, 467 U.S. at 242, 104 S.Ct. 2321 (internal quotation marks, citation, and internal editing omitted).

liberation [had] preceded its adoption," so it was appropriate "to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan." 545 U.S. at 484, 125 S.Ct. 2655. "Because that plan unquestionably serve[d] a public purpose, the takings challenged [in *Kelo* ] satisf[ied] the public use requirement of the Fifth Amendment." *Id.*

Mr. Franco argues that the taking at issue here fails the public use requirement because some of the factors mentioned in *Kelo* are not present. (He argues especially that the identities of the benefiting private parties were known before the taking was authorized by the legislature and that there is no comprehensive plan for redeveloping the area.) However, nothing in *Kelo* suggests that the items of evidence mentioned there set constitutional standards. Indeed, there are suggestions that the most important, perhaps determinative, consideration was that the plan "unquestionably serve[d] a public purpose." 545 U.S. at 484, 125 S.Ct. 2655.

We are, of course, aware of the related decision in *Franco v. District of Columbia,* 456 F.Supp.2d 35 (D.D.C.2006), which at first glance may appear to be inconsistent with our ruling. The United States District Court addressed many of the same allegations we consider here, and it held that "the defendants have sufficiently shown that the Skyland Legislation serves a 'conceivable public purpose.' " *Id.* at 40 (quoting *Midkiff,* 467 U.S. at 241, 104 S.Ct. 2321). It is important to consider the procedural posture of that case, however. The court had previously dismissed the suit, concluding that the plaintiffs' claims were not ripe, *see* 422 F.Supp.2d 216, 225 (D.D.C.2006), and was addressing a motion to alter or amend the judgment. Moreover, it considered its role to be limited— to determine whether the taking was fa-

cially unconstitutional. 456 F.Supp.2d at 39. In this context the court ruled that, "[b]ecause the taking was for a public use, and was not facially unconstitutional, the plaintiffs must first pursue state remedies for uncompensated takings before seeking relief in federal court." *Id.* at 40. Ruling on a facial challenge, the court had not held any evidentiary hearings, and it did not rule on the claim of pretext. Here, by contrast, we have held that Mr. Franco has sufficiently pleaded a defense of pretext. That defense must now be resolved on its merits.

We emphasize that further proceedings, including discovery, should honor the "longstanding policy of deference to legislative judgments" concerning the public purpose of a taking. *Kelo,* 545 U.S. at 480, 125 S.Ct. 2655. The Supreme Court has explained, and reiterated, that "[t]he role of the judiciary in determining whether th[e] power [of eminent domain] is being exercised for a public purpose is an extremely narrow one," *Berman,* 348 U.S. at 32, 75 S.Ct. 98; *accord, Midkiff,* 467 U.S. at 240, 104 S.Ct. 2321, and *Kelo* did not repudiate those statements. Moreover, " '[o]nce the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.' " *Kelo,* 545 U.S. at 489, 125 S.Ct. 2655 (quoting *Berman,* 348 U.S. at 35–36, 75 S.Ct. 98). And resolving the pretext defense does not necessarily require a trial. We simply hold that in this case the defense may not be rejected as a matter of pleading.

## V. The Order Granting Immediate Possession

The trial court expressly linked the grant of immediate possession to its decision to strike Mr. Franco's defenses. Because we have held that the court improp-

erly struck the pretext defense, we in turn vacate its grant of immediate possession. NCRC argues that the court could have granted immediate possession without striking the defenses. That may be true, but we cannot be sure that the court would have done so. We therefore remand for further consideration of this issue.

We are concerned, however, about the practicalities of transferring possession back to Mr. Franco. We anticipate that NCRC will renew its motion for immediate possession and will urge the trial court to grant that motion before resolving the pretext defense. Title has already passed to NCRC, see D.C.Code § 16–1314(b) (2001), and it is at least possible that the trial court will once again transfer immediate possession to NCRC. Because such a scenario would be disruptive, to say the least, we stay (for a period of ninety days following issuance of our mandate) any reversion of the property that may flow from this decision so that the parties may engage in further litigation on the possession issue in the Superior Court. We discern no harm in staying this portion of our judgment for a short period, since courts commonly consider possession of condemned property separately from the propriety of a taking. *See, e.g., Atlantic Seaboard Corp. v. Van Sterkenburg,* 318 F.2d 455, 460 (4th Cir. 1963) ("the condemnation court possesses the power to authorize immediate entry by the condemnor upon the condemned premises.... [I]f it should ultimately be held that the taking, itself, was improper, the condemnor, who had entered upon the land pending appeal, would be responsible to the owner for damages."). *Accord, East Tennessee Natural Gas Co. v. Sage,* 361 F.3d 808, 826 (4th Cir.2004).

## VI. Conclusion

For the foregoing reasons, we reverse the judgment of the Superior Court and remand for further consideration of Mr. Franco's pretext defense. We also vacate the order granting NCRC's motion for immediate possession (subject to the stay described above).

*So ordered.*