**POTOMAC DEVELOPMENT CORP., et al., Appellants,**

v.

**DISTRICT OF COLUMBIA, et al., Appellees.**

No. 10–CV–632.

District of Columbia Court of Appeals.

Argued April 12, 2011.

Decided Sept. 15, 2011.

---

William Daniel Sullivan, Washington, DC, for appellants.

Carl J. Schifferle, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellees.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and EPSTEIN, Associate Judge, Superior Court of the District of Columbia.*

EPSTEIN, Associate Judge, Superior Court of the District of Columbia:

The principal issues in this case involve a claim that the District of Columbia effectively took private property even though the owner kept the legal right to

* Sitting by designation pursuant to D.C.Code § 11–707(a).

use or sell it. A government may accomplish a de facto taking if it announces its intent to take property through an eminent domain proceeding, but then engages in extraordinary delay that leaves the property owner in limbo and results in severe economic harm. In their complaint, however, appellants do not allege facts from which such a de facto taking can plausibly be inferred. We affirm the judgment dismissing the complaint for failure to state a claim upon which relief can be granted.

## I. BACKGROUND

On October 29, 2009, Potomac Development Corporation, South Capitol Associates, and 1625 South Capitol Street S.W., LLC (collectively "appellants") filed an action against defendants District of Columbia and Gabe Klein, in his then-capacity as Director of the District Department of Transportation ("DDOT") (collectively the "District"). The complaint alleges the following facts.

Since the 1970s, appellants have owned and managed two pieces of real estate in the 1500 and 1600 blocks of South Capitol Street, S.W. The properties are within two blocks of Nationals Park, and the ballpark and other neighborhood development significantly increased the value of these properties, which are now occupied by industrial warehouses.

On June 21, 2005, DDOT informed appellants by letter that the District had decided to replace the Frederick Douglass Memorial Bridge (also known as the South Capitol Street Bridge) over the Anacostia River and that both of appellants' properties would be needed for approaches to the new bridge. The District intended to acquire these two properties and a few others as part of an "Advance Acquisition" program. On July 6, 2005, DDOT informed appellants to expect a formal notice of taking in January 2006 and completion of the taking by March 2006. In August 2005, DDOT confirmed that it would definitely take the two properties.

DDOT's timing predictions turned out to be incorrect. In May 2006, DDOT informed appellants that it expected to receive approval to move forward with the acquisition process during the summer of 2006 and that the process would take approximately six months to complete. In August 2006, DDOT informed appellants that its plans to acquire one of the two properties were still on track and that it would send notices to property owners in the fall. However, after inquiries from appellants, DDOT notified them in October 2006 that the acquisition had been delayed, that DDOT expected approval by January 2007, and that it would proceed with the acquisition process at that time. DDOT did not respond to appellants' inquiries in January 2007 seeking further information.

After appellants followed up with the Mayor in February 2007, the Mayor responded in May 2007 that the acquisition schedule had been delayed until DDOT receives approval to acquire the properties. After further inquiries, DDOT sent a letter in August 2007 stating that it did not anticipate obtaining approval for property acquisition in time to complete the acquisition in 2007. Appellants' inquiries in early 2008 went unanswered.

In the summer of 2008, the District hired an appraiser, Ryland Mitchell, to provide appraisals of the properties. The District previously engaged Mr. Mitchell to perform appraisals of properties that the District took for construction of Nationals Park. In August 2008, Paul Schray, the consultant that the District put in charge of acquiring rights for the bridge replacement project, informed appellants that he would make the offers that are a predicate to commencing formal condem-

nation proceedings, and that he expected to make these offers in or about December 2008, after Mr. Mitchell completed his appraisals. In December 2008, Mr. Schray informed appellants that Mr. Mitchell had not completed the appraisals and that Mr. Schray anticipated making offers sometime in the first quarter of 2009.

In February 2009, Mr. Schray informed appellants that the District once again confirmed that it would proceed with taking the two properties, that Mr. Mitchell would make site visits in late February, and that Mr. Schray expected to present offers to purchase the properties in late March or early April 2009. Mr. Mitchell did not make the site visit until late March 2009, and he informed appellants that the District might take only a portion of the properties.

In or about June 2009, the District dismissed Mr. Mitchell as the appraiser for the properties because Mr. Mitchell was on the verge of issuing written appraisals at higher values than the District wanted to pay. As a result, the District delayed the process once again while it sought another appraiser, whom it engaged a few weeks later in the beginning of July 2009. Although Mr. Schray told appellants to expect the new appraiser to contact them in the near future, the new appraiser did not. In early August 2009, Mr. Schray informed appellants that the new appraiser had not completed his appraisal of another property that he was supposed to have finished in the preceding month.

In October 2009, appellants filed their lawsuit. Appellants allege that because of the threat of imminent condemnation, they could not develop or profitably use the properties or sell them to other developers. As a result, appellants "have been in a long-term holding pattern with short-term leases." One property had two tenants under leases that permitted termination on three months' notice, and the other property is vacant and unleased. Before 2005, appellants had been able to lease "the properties as necessary to generate sufficient income to pay taxes to the District, maintain the properties, and (when feasible) generate net income, awaiting a time when the properties might become more valuable."

Appellants allege that based on comparable sales, properties in the area were worth $56 per buildable square foot in mid–2005, $65 per buildable square foot in early 2006, $100 per buildable square foot in late 2006, and $95 and $117 per buildable square foot in mid–2008. Appellants seek damages of at least $34 million based on the number of buildable square feet of the two properties and a fair market value of not less than $100 per buildable square foot.

On March 17, 2010, Judge Joan Zeldon granted the District's motion to dismiss without prejudice because appellants had not lost all economically beneficial uses of their property and they did not make "factual allegations that would support a conclusion that the delay of less than five years was unwarranted, excessive or extraordinary." On April 19, 2010, Judge Zeldon denied appellants' motion for reconsideration. On May 19, 2010, appellants filed a timely notice of appeal.[1]

## II. ANALYSIS

Appellants pled three causes of action for damages under 42 U.S.C. § 1983:(1) just compensation for a taking of the properties for a public purpose under the Just

---

**1.** Appellants informed us at oral argument in April 2011 that the District still has not either initiated eminent domain proceedings or de-finitively informed appellants that it would not acquire their properties.

Compensation Clause of the Fifth Amendment of the United States Constitution; (2) inverse condemnation; and (3) violation of the Due Process Clause of the Fifth Amendment. We address each cause of action.

## A. The taking claim

Appellants allege that the District in effect took their properties by announcing that it would imminently condemn the properties, but then delayed the initiation of eminent domain proceedings, leaving appellants unable to develop, sell, or profitably lease their properties. For ease of reference, we call this a "delay-based" taking claim. Appellants contend that the District's alleged actions constitute a de facto or "regulatory" taking under the standards announced in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

The District makes two principal arguments: (1) announcement of an intent imminently to take properties, followed by a substantial delay, cannot result in a taking because the owner remains free to use, lease, develop, or sell the properties in the meantime; and (2) even if we reject this argument, appellants still do not state a claim under the *Penn Central* test. We consider each set of issues in turn.

### 1. The elements of delay-based taking claims

The District argues that the absence of any formal restriction on appellants' property rights precludes any finding of a taking. Analysis of the elements of a delay-based taking claim under *Penn Central* demonstrates the fallacy of this argument.

For a determination of whether a regulatory taking has occurred, *Penn Central* requires "essentially ad hoc, factual inquiries" into "the particular circumstances in that case." *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. These factual inquiries involve two general factors: (1) the "character of the governmental action;" and (2) "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Id.*

As this case illustrates, the *Penn Central* factors may be interrelated. Here, the principal issue relating to the character of the governmental action is whether the District engaged in extraordinary delay after it announced an intent promptly to take appellants' properties, and the principal issue relating to the economic impact of the District's actions involves the extent to which the alleged delay affected appellants' ability to use or sell the properties or to benefit from appreciation in their value. Not only is delay relevant in assessing the character of the governmental action under *Penn Central*, but delay may also implicate the other prong of the *Penn Central* analysis by exacerbating the economic impact on the property owner. On the other hand, extraordinary delay may not cause a taking because its economic impact is not sufficiently severe, and delay that is merely ordinary may not cause a taking even though it produces severe economic impact.

### a. The character of governmental action

The first major factor under *Penn Central* involves the character of the government's action. As appellants concede, the general rule is that delay following a government's announcement of an intent to take property does not result in a taking. A government's pre-condemnation activities generally do not constitute a taking "[e]ven if the appellants' ability to sell

their property was limited during the pendency of the condemnation proceeding" and even if its fair market value declined. *Agins v. Tiburon*, 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (citations and quotations omitted). Indeed, formal initiation of condemnation proceedings, though it affects the owner's ability to profitably use or sell the land, generally does not cause inference with the owner's property interests that is "severe enough to give rise to a taking." *Kirby Forest Industries v. United States*, 467 U.S. 1, 15, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). "At least in the absence of an interference with an owner's legal right to dispose of his land, even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment." *Id.; see First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 320, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (discussing "the unexceptional proposition that ... depreciation in value of the property by reason of preliminary activity is not chargeable to the government"). The announcement of government planning, like legislation for or the beginning of a project, "long before any condemnation activities, may have an effect on value of lands involved, sometimes a beneficial, sometimes an adverse effect," but any decreases in value " 'are incidents of ownership' " and " 'cannot be considered as a "taking" in the constitutional sense.' " *Reservation Eleven Associates v. District of Columbia*, 136 U.S.App. D.C. 311, 420 F.2d 153, 157, 158 (1969) (quoting *Danforth v. United States*, 308 U.S. 271, 285, 60 S.Ct. 231, 84 L.Ed. 240 (1939)).

 The general rule that post-announcement delay does not ordinarily result in a taking, however, is not absolute, and the character of the government's de-

lay may give rise to a taking claim under *Penn Central.* "Delay in the regulatory process cannot give rise to takings liability unless the delay is extraordinary" and "[i]f the delay is extraordinary, the question of temporary regulatory takings liability is to be determined using the *Penn Central* factors." *Appolo Fuels v. United States*, 381 F.3d 1338, 1351 (Fed.Cir.2004); *see Agins*, 447 U.S. at 263 n. 9, 100 S.Ct. 2138 ("extraordinary delay" may give rise to a taking claim).

 Whether delay is extraordinary depends on its length and the reasons for it. "[T]he duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe–Sierra Preservation Council v. Tahoe Regional Planning Agency*, 535 U.S. 302, 342, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). No categorical rule establishes how long governmental action must preclude use of property before a taking occurs. *See id.* at 335, 122 S.Ct. 1465. Delays that qualify as extraordinary typically last for a substantial length of time. *Bass Enterprises Production Co. v. United States*, 381 F.3d 1360, 1366 (Fed.Cir.2004) (citations omitted). However, "[t]he question of whether a delay is extraordinary is not a simple matter of the number of months or years taken by the Government to make its decision...." *Id.* (citing *Tahoe–Sierra Preservation Council*, 535 U.S. at 333, 337–38, 122 S.Ct. 1465). "Instead of such an easy guidepost, courts must evaluate a number of factors to determine whether the delay is extraordinary," including the reasons for the delay and whether the delay is proportionate to the nature of the government process. *Bass Enterprises Production Co.*, 381 F.3d at 1366. Courts recognize that "delay is inherent in complex regulatory ... schemes" and that they therefore "must examine the nature of the ... process as

well as the reasons for any delay." *Wyatt v. United States,* 271 F.3d 1090, 1098 (Fed. Cir.2001). In assessing the reasons for the delay, courts may consider whether the government acted in good faith, and some courts have been reluctant to find extraordinary delay in the absence of bad faith by the government. *See id.*

Government action of an arbitrary or abusive character may also give rise to a de facto taking claim. *See Acorn Land, LLC v. Baltimore County,* 402 Fed.Appx. 809 (4th Cir.2010) (per curiam) (regulatory taking occurred where a court found that a local government's refusal to take action to permit development was arbitrary, and the government then effectively sidestepped the court's order by rezoning the property); *Amen v. City of Dearborn,* 718 F.2d 789, 797 (6th Cir.1983) (de facto taking occurred when the city "chose not to invoke its condemnation powers, but, rather, elected to engage in a deliberate course of conduct to force the sale of private property at reduced value" as part of redevelopment plan); *Archer Gardens v. Brooklyn Center Dev. Corp.,* 468 F.Supp. 609, 613 (S.D.N.Y.1979) (taking occurred through "abuse of legitimate condemnation powers" where the government tried to appropriate private properties through tax foreclosure proceedings instead of the previously announced condemnation proceeding in which it agreed to pay a substantially higher price).

### b. The economic impact of governmental action

 The other principal factor in the *Penn Central* test involves the economic impact of the governmental action. A plaintiff must show "deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking." *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 493, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *District In-* *town Properties Ltd. Partnership v. District of Columbia,* 339 U.S.App.D.C. 127, 198 F.3d 874, 879 (1999) ("a claimant must put forth striking evidence of economic effects to prevail even under the ad hoc inquiry" mandated by *Penn Central*). The economic impact of the governmental action in a de facto taking case must be severe because "even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment." *See Kirby Forest Industries,* 467 U.S. at 15, 104 S.Ct. 2187.

 A regulatory taking may occur even if an announcement of the intent to take property does not deprive the owner of *all* economically beneficial use. Even when the owner can still make some economically beneficial use, "a taking nonetheless may have occurred," depending on the complex of factors discussed in *Penn Central. Palazzolo v. Rhode Island,* 533 U.S. 606, 615–17, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). *Penn Central* standards determine whether a regulatory taking occurred outside the relatively narrow category of regulations that completely deprive property owners of all economically beneficial use, and as a result, a *"Penn Central* taking" involves a different theory than a " 'total regulatory taking.' " *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538, 548, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *see Palazzolo,* 533 U.S. at 632, 121 S.Ct. 2448 (remanding for examination of claims "under the *Penn Central* analysis" after upholding finding that regulatory actions did not deprive the property of all economic value). That a de facto restriction of a landowner's use of its property is *temporary* rather than *permanent* is also not dispositive. *First English Evangelical Lutheran Church,* 482 U.S. at 328, 107 S.Ct. 2378 (temporary denial of all use of property while subsequently invalidated

regulation was in effect may constitute a taking).

■ The Takings Clause "was 'designed to bar Government from forcing some people alone to bear burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Tahoe–Sierra Preservation Council,* 535 U.S. at 321, 122 S.Ct. 1465 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). If extraordinary delay imposes on one property owner severe economic burdens, fairness and justice may require the public as a whole to bear them even if the owner retains some economic use of the property.

### c. The narrowness of the exception

■ As these cases demonstrate, there exists only a narrow exception to the general rule that substantial delay in carrying out an announced intent to take property, coupled with substantial adverse economic impact, do not constitute a taking. Appellants themselves acknowledge that a delay-based taking claim requires extraordinary circumstances, and they undertake to meet this standard by claiming "unreasonable delay and grossly improper conduct," "deliberate and unjustifiable government misconduct," "deliberate fraud on the rights of plaintiffs," and "a gross injustice."

The narrowness of the exception reflects two considerations. First, a broader exception would be contrary to public and private interests in advance announcement of capital projects that substantially affect the community. Before an agency breaks ground on any significant project, whether or not it would require any taking, the agency should be able to get input from the community, which requires advance notice. Early public announcement may also benefit targeted property owners by enabling them to avoid wasteful investment; as appellants acknowledge, property owners may not want to make substantial investments if an impending taking would prevent them from realizing a reasonable return. A lax standard for delay-based taking claims would discourage timely announcement and "encourage hasty decision-making." *See Tahoe–Sierra Preservation Council,* 535 U.S. at 335, 122 S.Ct. 1465. As the Second Circuit stated, "We do not believe that the Takings Clause requires a state to choose among planning in secret, not planning at all, and exposing itself to takings claims from every property owner whose land might be affected by its plans." *Santini v. Connecticut Hazardous Waste Management Service,* 342 F.3d 118, 133 (2d Cir. 2003).

The second reason for limiting delay-based taking claims to truly extraordinary circumstances is that intensive review of the management of municipal projects by the courts would raise serious separation of powers issues.[2] Courts avoid legal standards in takings cases that "would empower—and might often require—courts to substitute their . . . judgments for those of elected legislatures and expert agencies." *Lingle,* 544 U.S at 544, 125 S.Ct. 2074. Courts "eschew intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." *Franco v. Na-*

---

**2.** Fact-based review of municipal project management could be conducted by judges or juries. In *City of Monterey v. Del Monte Dunes,* 526 U.S. 687, 721–22, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), the Supreme Court held that the plaintiff in a § 1983 case had a right to a jury determination of fact-bound questions whether the city's decision to reject a particular development plan bore a reasonable relationship to its proffered justifications and whether the landowner was deprived of all economically viable use of his property. Here, appellants did not request a jury trial.

*tional Capital Revitalization Corp.*, 930 A.2d 160, 168 (D.C.2007). Although *Franco* involved deference to legislative branch judgments about whether a taking is for a public purpose, the same principles apply to executive branch judgments about how to manage a project that includes takings for indisputably public purposes.[3] The executive branch is entrusted with principal responsibility to decide what is a reasonable amount of time to obtain public comment and complete planning, and what are the relative costs and benefits of extending an initial schedule to seek further public comment, refine plans, or achieve other valid goals. Courts should not adopt a standard for delay-based taking claims that would permit judges or juries to second-guess these judgments. *See Bass Enterprises Production Co.*, 381 F.3d at 1367 ("Governmental agencies that implement complex permitting schemes should be afforded significant deference in determining what additional information is required to satisfy statutorily imposed obligations.") (quotation and citation omitted).

## 2. Sufficiency of the pleadings

This brings us to the question of whether appellants' factual allegations of a delay-based taking are sufficient to survive a motion to dismiss under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure. The answer is that they are not.

### a. Standard of review

■ We review *de novo* dismissal of a complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. *Grayson v. AT & T Corp.*, 15 A.3d 219, 228 (D.C.2011) (*en banc*) (citation omitted).

■ A complaint should be dismissed under Rule 12(b)(6) if it does not satisfy the pleading standard in Rule 8(a). Rule 8(a) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." In this respect, Rule 8(a) mirrors Rule 8(a) of the Federal Rules of Civil Procedure. "By statute, the Superior Court must 'conduct its business according to the Federal Rules of Civil Procedure ... unless it prescribes or adopts rules which modify those Rules.'" *Williams v. United States*, 878 A.2d 477, 482 (D.C. 2005) (quoting D.C.Code § 11–946). The Superior Court has not prescribed or adopted any rule that modifies Federal Rule 8(a). Consistent with the requirement of D.C.Code § 11–946, "[w]e construe rules that are substantially identical to the corresponding federal rule in light of the meaning given to the federal rule." *Behradrezaee v. Dashtara*, 910 A.2d 349, 356 n. 8 (D.C.2006). We must therefore construe Superior Court Rule 8(a) consistent with Federal Rule 8(a) as interpreted by the Supreme Court of the United States.

**3.** Another instructive decision is *District of Columbia v. Sierra Club*, 670 A.2d 354 (D.C. 1996). We held that the Mayor's decision to suspend a curbside recycling program was judicially reviewable under the D.C. Administrative Procedure Act ("APA"), *see* D.C.Code § 2–510(a)(2), but that the Mayor still had discretionary authority to establish spending priorities and manage the city's budget. We recognized that separation of powers concerns, especially where spending is concerned, may require courts adjudicating a challenge to agency action to avoid interference in the business of the executive branch. 670 A.2d at 365–66. Similarly, any judicial review of whether initiation of formal condemnation proceedings was unreasonably delayed should avoid interference in the business of the executive branch. *Cf. Sierra Club v. Thomas*, 264 U.S.App.D.C. 203, 828 F.2d 783, 797 (1987) (absent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable of a proceeding is entitled to considerable deference).

■ In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court construed the pleading standard of Federal Rule 8(a):

[T]he pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . . To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

*Id.* at 1949 (citations omitted to *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Supreme Court summarized the analytical framework that a court should use in evaluating a Rule 12(b)(6) motion:

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 129 S.Ct. at 1950.[4] Pursuant to D.C.Code § 11–946, we interpret Superior Court Rule 8(a) to include this plausibility standard.

■ A court should be circumspect in assessing the sufficiency of a complaint in any case where the substantive legal standard requires a fact-intensive inquiry. *See Hornstein v. Barry*, 560 A.2d 530, 537–38 (D.C.1989) (*en banc*) (noting that a limited record may make it "problematical" to resolve through summary judgment a de facto taking case in which "an *ad hoc* case by case inquiry is called for"). However, the pleading standards in Rule 8 contain no exception for complaints alleging a claim evaluated under a fact-intensive standard. *See Iqbal*, 129 S.Ct. at 1953 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions . . .' "). The ad hoc factual nature of the inquiries under *Penn Central* and the lack of an easy-to-apply formula do not mean that allegations of some delays in connection with a major public works project coupled with some economic harm suffice to state a delay-based taking claim. The plaintiff must still allege facts sufficient to support plausible inferences concerning both factors in a viable legal delay-based taking claim—extraordinary delay and severe economic harm. *See Williams v. District of Columbia*, 9 A.3d 484, 488 (D.C.

4. We have not previously decided whether to follow the plausibility standard articulated in *Twombly* and *Iqbal*. *See Grayson*, 15 A.3d at 229 n. 16; *Oh v. National Capital Revitalization Corp.*, 7 A.3d 997, 1005 n. 10 (D.C.2010); *Solers, Inc. v. Doe*, 977 A.2d 941, 948 n. 5 (D.C.2009). We adopted the plausibility standard in one case, but the opinion was vacated as moot because it turned out the parties settled the case before the opinion was issued. *Mazza v. Housecraft, LLC*, 18 A.3d 786 (D.C.), *vacated as moot*, 22 A.3d 820 (D.C.2011) (per curiam). Because of the persuasiveness of the vacated opinion in *Mazza*, we draw on it here.

2010) ("To survive a motion to dismiss, a complaint must set forth sufficient information to outline the legal elements of a viable claim for relief or to permit inferences to be drawn from the complaint that indicate that these elements exist.") (citation and quotation omitted).

 "Recognizing the limited role of the courts in eminent domain jurisprudence, we are especially careful not to indulge baseless, conclusory allegations that the legislature [or executive branch] acted improperly." *See Franco,* 930 A.2d at 171 (applying the Rule 12(b)(6) standard in evaluating the sufficiency of an affirmative defense). Assessment of the sufficiency of the factual allegations must take into account "the heavy burden placed upon one alleging a regulatory taking." *See Keystone Bituminous Coal Ass'n,* 480 U.S. at 493, 107 S.Ct. 1232. We do not apply a heightened pleading standard in regulatory takings cases. *Cf. Williams,* 9 A.3d at 491 (no heightened pleading standard for defamation claims even though plaintiffs may be required to meet a rigorous liability standard mandated by the First Amendment). In taking cases, like other cases, a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Franco,* 930 A.2d at 172 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955) (internal quotation marks and citation omitted). Nevertheless, like evaluation of an affirmative defense that the claimed public purpose for a taking was pretextual, evaluation of a claim that the District abused the eminent domain process does not require us to stretch to draw dubious inferences that the executive branch acted improperly. *Cf. Oh v. National Capital Revitalization Corp.,* 7 A.3d 997, 1002–03 (D.C.2010) (holding under lenient pleading standard that party failed

adequately to allege that the taking was under a pretext of a public purpose).

 Even if discovery might reveal facts supporting a delay-based taking claim, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 129 S.Ct. at 1950. In all cases, "the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process." *Id.* at 1953 (citing *Twombly,* 550 U.S. at 559, 127 S.Ct. 1955). Just as "rejection of the careful-case-management approach is especially important in suits where Government-official defendants are entitled to assert the defense of qualified immunity," *Iqbal,* 129 S.Ct. at 1953, it is especially important in suits like this taking case where courts avoid intruding into decisions entrusted to the executive branch.

#### b. Discussion

Appellants have not alleged facts that permit plausible inferences of (1) extraordinary delay or (2) severe economic harm under *Penn Central.*

#### i. Extraordinary delay

 Appellants do not allege facts concerning the character of the governmental action that support a plausible inference of extraordinary delay. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950. It is in a common-sense context that we examine appellants' two allegations concerning problems with the District's behavior: (1) misinformation about the timing of the takings; and (2) replacement of the appraiser initially hired by the District.

First, appellants allege that the District's predictions about the imminence of the takings turned out to be inaccurate. It would be unreasonable to infer from this allegation that the District's delay was extraordinary or unjustified. Appellants make no claim that the District knew any prediction was false at the time it made the prediction, and they did not allege fraud "with particularity" as Super. Ct. Civil P. Rule 9(b) would require. Appellants admit that when the District made these predictions, it was planning to replace the Frederick Douglass Memorial Bridge and genuinely intended to take their properties for that public purpose.

Equally important, appellants make no factual allegations concerning the reasons why the District did not meet the schedule it initially described, much less that the reason or reasons for the delay were illegitimate. *See Bass Enterprises Production Co.*, 381 F.3d at 1367 (courts must consider reasons for delay). In fact, appellants acknowledge that the timing of the announcement of the planned taking "may have had any number of reasons behind it," and that reasons for delay such as "budgetary restraints, administrative priorities, planning needs and the like" are wholly legitimate. Appellants do not allege that at any time before they filed the lawsuit, the District had completed the public comment process, finalized its analyses and plans, and obtained all necessary funding. It would be unreasonable to characterize as unwarranted the District's decision to wait if it was not ready and able to proceed with the bridge replacement project.

Indeed, as discussed in Section II.A.2.b.ii below, appellants allege that the fair market value of their and other properties near Nationals Park increased substantially during the period of delay, and the District had every reason to move as quickly as possible if delay would cause the amount of just compensation to increase. It would be at best speculative to infer from the facts alleged by appellants that the District needlessly or arbitrarily pushed back its initial schedule even though rising real estate values made delay costly to the District.

Moreover, at oral argument, appellants stated that if the District had told them that it did not know when the planned taking would occur, appellants would have no claim that a de facto taking occurred in the interim, and for a substantial part of the four-year period of delay, appellants knew from the District's communications and non-communications that the timing of the actual taking was uncertain at best. The complaint alleges that after the initial optimistic predictions in 2005 and 2006, the Mayor informed appellants in mid–2007 that the acquisition schedule had been delayed and that DDOT had not obtained needed approval to acquire the properties. Appellants do not allege that the Mayor predicted when any missing approval would be granted or that the District subsequently told them that the District had managed to secure all necessary approvals.[5]

Another important part of the context-specific analysis is that appellants do not allege facts permitting a plausible inference that the *length* of the delay for this bridge replacement project is extraordi-

---

5. Appellants allege that on some occasions, the District failed to respond, or keep its promise to respond, to appellants' inquiries about the status of the project. However, even if the District should have responded, a few instances of non-responsiveness do not support a plausible inference that the District's reasons for deferring the takings were insubstantial or illegitimate.

nary. The four-year delay experienced by appellants is substantial. However, appellants allege no facts reasonably implying that it is extraordinary for the planning of a public works project of the magnitude of the replacement of the Frederick Douglass Memorial Bridge to take four years from public announcement to institution of formal eminent domain proceedings. For any major capital project like this one, planning is complex and time-consuming, environmental and other reviews take time to complete, and funding takes time to secure, especially when the District and federal governments face fiscal constraints. Appellants do not identify any comparable project in the District or in other jurisdictions that moved more quickly, much less make any factual allegations reasonably suggesting that projects of this scale *ordinarily* get underway in substantially less than four years. *See Bass Enterprises Production Co.*, 381 F.3d at 1367 (courts must consider whether the delay is disproportionate to the regulatory scheme from which it arises). Moreover, this four-year delay is no longer than the delay found not to be extraordinary in other cases. *Cf. id.* at 1366–67 (finding no taking despite 45-month delay in granting permit application for drilling); *Wyatt*, 271 F.3d at 1099 (same for six-year delay in granting permit application for mining); *see also Kirby Forest Industries*, 467 U.S. at 6–8, 104 S.Ct. 2187 (no taking occurred until 1982 when government actually acquired forest land for a national park, even though government publicly announced its desire to create the national park in the mid–1960s, legislation directing the acquisition was passed in 1974, and the government filed a condemnation case in 1978).

The second problem that appellants contend supports their delay-based taking claim is that the District replaced the first appraiser because it thought his appraisals would be too high. Although the District hired a new appraiser within a month, the new appraiser allegedly had to start from scratch, delaying the appraisal process by a longer period. Appellants, however, do not allege that but for replacement of the appraiser, the District could or would have initiated formal eminent domain proceedings before appellants filed this lawsuit, so this allegation does not support a claim that the delay was extraordinary or unjustified. To the extent the District's replacement of the original appraiser is suspicious, it would be suspicious regardless of the timing of initiation of eminent domain proceedings. As the trial court observed, appellants have a remedy for any illegitimate decision to replace the appraiser—calling the first appraiser as a witness in the eminent domain case to testify that the properties are worth more than the District claims. In any event, this allegation does not support a plausible inference that the District acted improperly or in bad faith. Appellants would be entitled to replace their appraiser if they thought his appraisals were too low, and the District has an equivalent prerogative. Appellants do not allege facts from which a plausible inference can be drawn that when the District discharged Mr. Mitchell, it believed that his expected appraisals were correct.

Appellants assert in conclusory terms that the District "actively, deliberately and consistently, over many years, prevented plaintiffs from making productive use of the properties." However, this is not a factual allegation but rather a pejorative spin on advance notice under the District's Advance Acquisition program. As appellants concede, it serves a valid public purpose for government to inform property owners in advance of plans to take their property so that owners will not make wasteful investments. *See* Section II.A.1.c

above.[6] Appellants also assert that the District deliberately singled out their property to ensure it would not increase in value. However, they allege no facts supporting that conclusory statement, and they admit that other properties were included in the District's Advance Acquisition program relating to the bridge replacement project.

In sum, appellants do not allege facts concerning the character of the District's actions that support a plausible inference of extraordinary delay. Appellants do not allege facts reasonably implying that it is extraordinary for a local government to take more than four (or even six) years to carry out takings in a major project like replacement of the Frederick Douglass Memorial Bridge, that the reasons for the delay were illegitimate or insubstantial, or that the District had obtained funding and completed all of the other actions necessary to proceed yet arbitrarily chose to wait, even though rising real estate values gave the District an incentive to take the properties as quickly as possible. In fact, appellants admit that, as far as they know, the reasons for the timing of the original announcement and the subsequent delays were entirely valid. In this context, the two problems alleged by appellants do not support a plausible inference that any effect on their ability to make productive use of the properties was not an unintended by-product of ordinary delays in a major bridge replacement project.

#### ii. Severe economic impact

Appellants' factual allegations do not support a plausible inference of severe economic harm caused by delay in initiating eminent domain proceedings after the District announced an intent to take.

It is reasonable to infer from the facts alleged by appellants that the Sword of Damocles hanging over these properties reduced their short-term income-generating potential to a small fraction of what it would otherwise have been. As the District argues, appellants do not allege facts from which it can reasonably be inferred that they were completely deprived of *all* economic use of the properties. Appellants admit that their "long-term holding pattern" leaves them able to enter into "short-term leases," and they in fact leased one property under an indefinite lease permitting termination on three months' notice. However, appellants allege that the impending taking reduced the income from the short-term lease for one property that they were able to negotiate to a level sufficient only to diminish their losses. As the District points out, appellants acknowledge that it was not always feasible in the three decades they owned the properties to generate a net income, and appellants do not allege that they attempted to find any short-term tenants for the other prop-

---

**6.** Appellants assert that the District acted with "the purpose of 'protecting' the price they might have to pay by forcing plaintiffs to make little or no productive use of their properties (the continuing assurances of prompt taking) or any better use (the warning not to develop the properties)." We do not address whether any alleged actions by the District would affect the amount of just compensation if and when the District brings an eminent domain action. If a government takes action whose sole or primary purpose is to depress the fair market value of properties it intends to take, any resulting decrease may be excluded from the calculation of fair market value. *See Reservation Eleven Associates,* 420 F.2d at 156 (a city "cannot artificially use another governmental power to reduce the just value cost payable on the exercise of its power to take private property through eminent domain"); *Allen Family Corp. v. City of Kansas City,* 525 F.Supp. 38, 40 (W.D.Mo.1981) (if extraordinary delay caused fair market value to be lower at the time of taking than it would otherwise be, the owner is entitled to compensation at the higher value).

erty that stands vacant and unleased. But appellants allege that the rent generated by any short-term lease in these circumstances would be artificially and substantially depressed by the District's actions. *See Palazzolo,* 533 U.S. at 615–16, 121 S.Ct. 2448 (if a taking is otherwise established, a government "may not evade the duty to compensate on the premise that the landowner is left with a token interest."); *Hornstein,* 560 A.2d at 537 (although the Just Compensation Clause does not "require that a landowner be permitted to make the most profitable use of his property," it is significant whether "the property is capable of earning a reasonable return within the governmental restrictions").

Moreover, appellants allege that the District's failure over four years to carry out its announced plans for an imminent taking left them unable to develop the properties to their full potential or to sell them to another developer, thus defeating their investment-backed expectations. Here again, it is plausible that repeated statements by the District of its intent imminently to take the properties would make it extremely difficult if not impossible for appellants to develop the properties or to sell them to another developer. It is no answer, as the District suggests, that appellants could have found a buyer because any buyer would be assured that it would receive just compensation in the event of a taking. It is plausible to infer from appellants' factual allegations that any potential purchaser while the properties remain in limbo could not make any more productive use of the properties than appellants themselves were able to make, so the only effect of the sale would be to substitute the purchaser for appellants as the plaintiff in a taking case. If the District's actions left appellants' properties with no economic value to *any* owner except the value of a just compensation claim against the District, the properties have no economic value for purposes of the *Penn Central* analysis.

However, appellants allege that the fair market value of the properties actually *increased* during the period of delay, so their ability to realize their long-term investment-backed expectations improved: based on sales or bona fide offers on comparable parcels, appellants contend that the fair market value of their properties increased from $50–65 per buildable square foot to over $100 between 2005 and 2009—that is, from roughly $20 million to $34 million. Because just compensation is generally measured at the time of the taking, *e.g., Danforth,* 308 U.S. at 283, 60 S.Ct. 231, appellants would have gotten about $14 million less if the District had taken their properties in 2006 before the delay began than in 2009 after the process became prolonged.

Although the impending taking adversely affected appellants' ability to develop or sell the properties and the short-term value of the property, the fact remains that these long-term investors benefitted from a substantial increase in property values around Nationals Park. Appellants therefore have not alleged facts indicating a "deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking." *See Keystone Bituminous Coal Ass'n,* 480 U.S. at 493, 107 S.Ct. 1232.

### iii. Summary

For these reasons, we conclude that appellants fail to state a claim on which relief can be granted under the *Penn Central* test. Appellants' allegations about the character and economic impact of the District's actions, individually and collectively, do not support a plausible inference that the District took their properties. In this taking case, we must be "especially careful

not to indulge ... conclusory allegations" that the executive branch acted improperly. *See Franco,* 930 A.2d at 171. Appellants pled "facts that are merely consistent with a defendant's liability," and they "stop[ped] short of the line between possibility and plausibility of entitlement to relief." *Iqbal,* 129 S.Ct. at 1949 (internal quotations and citations omitted). Like the plaintiff in *Iqbal,* appellants "would need to allege more by way of factual content to nudge [their claim] across the line from conceivable to plausible." *See id.* at 1952 (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

### B. The inverse condemnation claim

■ Appellants allege a cause of action under 42 U.S.C. § 1983 for inverse condemnation. "Inverse condemnation is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *See Agins,* 447 U.S. at 258, 100 S.Ct. 2138 (quotation and citation omitted); *First English Evangelical Lutheran Church,* 482 U.S. at 316, 107 S.Ct. 2378. Appellants do not state a claim for inverse condemnation under federal constitutional law or under District law.

■ For the reasons stated in the preceding section, appellants do not state a claim under the U.S. Constitution for a taking, and to the extent their inverse condemnation claim is based on the federal constitutional law, it fails.

■ Appellants argue that their inverse condemnation cause of action has a basis in District of Columbia law independent of federal constitutional law. District law is not the basis of the cause of action pled in the complaint, which invokes only § 1983, and § 1983, by its explicit terms, creates a cause of action only for a deprivation of rights secured by the U.S. Constitution.[7] Even if the complaint pled a cause of action under D.C. law, the result would be the same because no D.C. statute provides a broader remedy than the Just Compensation Clause affords. Appellants correctly contend that the U.S. Constitution does not preclude the District from deciding to pay compensation when the Fifth Amendment does not require it. But to state a claim, appellants must identify an affirmative statutory basis for courts to award damages against the District and to overcome its sovereign immunity.[8] Appellants cite nothing in the language or legislative history of the D.C. eminent domain statute or any other statute that the District intended to provide a broader remedy than the Constitution does. Although appellants are correct that we have never decided whether District law affords a broader remedy, earlier inverse condemnation cases applied Fifth Amendment principles in deciding whether a taking has occurred and what compensation is just. *E.g., D.C. Redevelopment Land Agency v. Dowdey,* 618 A.2d 153, 164 (D.C.1992).[9] We

---

7. The Fifth Amendment applies to the District of Columbia. *See Scales v. District of Columbia,* 973 A.2d 722, 725 n. 1 (D.C.2009).

8. States are of course free to adopt state constitutions or statutes that provide for compensation in circumstances that the U.S. Constitution does not. *See Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345, 1356 (1972) (providing relief under the Supreme Court's interpretation of the state constitution); *Johnson v. City of Minne-*

*apolis,* 667 N.W.2d 109, 115 (Minn.2003) (same).

9. Appellants contend that *Dowdey* "is a good example of this Court having relied on its own common law to provide a 'taking' claim beyond that required by the federal constitution." However, the only portion of the *Dowdey* opinion discussing Fifth Amendment principles states only that a D.C. statute cannot require payment of less than just compensation within the meaning of the Fifth Amend-

have refused to award in a condemnation case more compensation than the Fifth Amendment requires because, "[h]ad the Council of the District of Columbia intended that the District [provide more than constitutionally just compensation], its intent would be obvious on the face of the condemnation statute, or at least in its legislative history . . . ." *Mamo v. District of Columbia*, 934 A.2d 376, 384 (D.C.2007).

 Moreover, allowing property owners to obtain just compensation in circumstances not required by the Just Compensation Clause could have undesirable effects. As explained in Section II.A.1.c above, Just Compensation Clause jurisprudence strikes a balance between, on the one hand, providing a remedy to property owners singled out for unequal and burdensome treatment and, on the other, encouraging local governments to make timely announcements of their intent to take property and avoiding judicial interference with the management of public works projects by the executive branch. If the District should afford a broader remedy than the Just Compensation Clause, the Council of the District of Columbia, not the courts, should make that decision.

## C. The due process claim

Appellants' third and final cause of action is for a violation of their procedural rights under the Due Process Clause. Appellants fault the District for lacking "any standards for conducting their Advance Acquisition program to ensure that properties generally, or the subject properties specifically, would be taken within a reasonable time of the defendants' stated intent to take such properties."

 "In evaluating a due process claim brought under § 1983, 'it is necessary to ask what process the State provided, and whether it was constitutionally adequate.'" *Agomo v. Fenty*, 916 A.2d 181, 191 (D.C.2007) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). "The Supreme Court has set forth a balancing test to determine whether a state's due process procedures are adequate: 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Agomo*, 916 A.2d at 191 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). The balancing test adopted in *Mathews v. Eldridge* "is applied to the *generality of cases;* the fundamental fairness of a particular procedure does *not* turn on the result obtained in any individual case." *Donnelly Associates v. District of Columbia Historic Preservation Review Board*, 520 A.2d 270, 282 (D.C.1987) (emphasis added) (internal quotations and citations omitted). The facts alleged by appellants, and the inferences that can reasonably be drawn from them, do not indicate that the three legal elements of a viable procedural due process claim exist.

 First, "[t]he extent to which a person may be condemned to suffer grievous loss is in part determinative of what process is due him." *Donnelly Associates*, 520 A.2d at 279 (internal quotations and citations omitted).[10] Although appellants

---

ment—not that any D.C. statute requires more.

10. In *Donnelly Associates,* we decided the constitutional issue without evidentiary hearing or trial.

allege that the delay they experienced resulted in serious economic loss, they do not allege that delays after the District announces an imminent intent to take "*generally* will result ... in serious economic loss." *See id.* at 282 (emphasis added). When the District informs a property owner that it intends to take property, the owner does not necessarily suffer a grievous loss while the owner waits for the District to initiate formal condemnation proceedings or decide definitively not to take their properties. In addition, evaluation of economic loss in the generality of cases includes "the finality of the deprivation," and temporary interference with protected interests is less likely to trigger due process scrutiny. *See id.* at 280–81 (availability of just compensation if an historic property designation results in a restriction so severe as to amount to taking ensures that "any designation with such a harsh consequence necessarily will be temporary only"). A property owner has a procedural remedy for extraordinary delays in the pre-condemnation process that cause grievous harm: a delay-based taking claim for just compensation.

Second, nothing in the complaint suggests that the risk of extraordinary delay or abuse of the eminent domain process is substantial in the generality of cases. Appellants do not contend that their alleged experience is typical for property owners who receive notice that the District intends to take their property. Moreover, nothing in the complaint indicates the probable value of new procedural safeguards. Indeed, appellants do not describe the safeguards that they contend the District should adopt, nor do they suggest that other jurisdictions have adopted any such safeguards. Any one-size-fits-all deadline for instituting formal condemnation proceedings, or even responding to inquiries from property owners, would be necessarily arbitrary. Because the amount of time between announcement and institution of eminent domain proceedings that is reasonable may vary widely depending on the circumstances, and because justifiable delays (predictable and unpredictable) regularly occur in public works projects, the District could reasonably build flexibility into any new procedures. To the extent appellants want procedures for property owners in their position to get complete and accurate information about the status of the District's plans, appellants do not explain why requests under the Freedom of Information Act, D.C.Code § 2–531 *et seq.*, do not satisfy any constitutional requirements.

Finally, we consider the government's interests, including the costs of additional procedural safeguards. " 'At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost.' " *Richard Milburn Public Charter Alternative High School v. Cafritz,* 798 A.2d 531, 547 (D.C. 2002) (quoting *Mathews,* 424 U.S. at 348, 96 S.Ct. 893). The complaint does not address the fiscal and administrative burdens necessarily imposed by a new set of procedures and deadlines for the process leading up to the decision of whether to institute formal eminent domain proceedings.

For these reasons, appellants fail to state a claim on which relief can be granted under the Due Process Clause.

## III. CONCLUSION

Appellants' factual allegations (and they remain only allegations) paint a picture of understandable frustration produced by a combination of bureaucratic over-optimism and unresponsiveness. Nevertheless, the facts alleged by appellants, and the infer-

ences that can reasonably be drawn from those facts, do not indicate the extraordinary delay or severe economic injury that are essential elements of a delay-based taking claim. Nor do appellants state a claim on which relief can be granted for inverse condemnation under D.C. law or for a violation of the Due Process Clause. The judgment below is

*Affirmed.*