**Mary Rose GREENE, et al., Appellants**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 11–CV–1626.**

District of Columbia Court of Appeals.

Argued June 29, 2012.
Decided Dec. 6, 2012.

Ralph Werner, Washington, for appellants.

Carl J. Schifferle, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, William D. Burk, Chief, Land Acquisition

& Bankruptcy Section, and Edward P. Henneberry, Assistant Attorney General, were on the brief, for appellee.

Before OBERLY, BECKWITH, and EASTERLY, Associate Judges.

EASTERLY, Associate Judge:

With this case we return to the District of Columbia's revitalization project for the Skyland Shopping Center area in Ward 7.[1] Appellant, Mary Rose Greene, owned property near the shopping center. After a portion of her property was condemned, a jury trial was held to determine her compensation for the taking. The jury awarded Ms. Greene almost two million dollars. Ms. Greene now appeals.

Setting aside her challenge to the trial court's subject matter jurisdiction, which we reject,[2] Ms. Greene's central claim is that she was inadequately compensated for two reasons: (1) the trial court did not permit her to present evidence of severance damages—*i.e.*, evidence that the tak-

ing reduced the value of her untaken land—and (2) the trial court improperly restricted her expert appraiser's testimony. We find no merit to these arguments.[3] Where Ms. Greene had no claim for severance damages as a matter of law, the trial court properly acted as gatekeeper and precluded Ms. Greene from presenting evidence to the jury on this theory. Likewise, the trial court did not abuse its discretion when it limited Ms. Greene's expert appraiser's testimony regarding his foundation for his valuation of the taken land. We affirm.

## I. FACTS

As the proceedings in this case spanned years, we summarize only the facts necessary to put our legal analysis in context.

From the mid–1960s to the mid–1990s, Ms. Greene acquired a number of contiguous plots amounting to approximately eight and a half acres of land, forming a crescent shape, in the Southeast quadrant of the District of Columbia.[4] The land at

---

1. We have previously heard cases arising out of the Skyland project in *Franco v. District of Columbia*, 39 A.3d 890 (D.C.2012) (*Franco III*), *DeSilva v. District of Columbia*, 13 A.3d 1191 (D.C.2011), *Duk Hea Oh v. Nat'l Capital Revitalization Corp.*, 7 A.3d 997 (D.C.2010), *Franco v. District of Columbia*, 3 A.3d 300 (D.C.2010) (*Franco II*), and *Franco v. Nat'l Capital Revitalization Corp.*, 930 A.2d 160 (D.C.2007) (*Franco I*).

2. This same subject matter jurisdiction challenge was addressed and rejected in *Franco III*, 39 A.3d at 893–94. We have nothing to add to *Franco III's* cogent analysis of that issue.

3. We also find no merit to the remainder of Ms. Greene's arguments on appeal. Ms. Greene argues separately that she should have been able to present evidence to the jury of her ownership of the untaken property (which enjoys access to public streets) in order to prevent the jury from speculating about the cost of accessing the taken property (which does not). The lack of access to the

taken property was never raised at trial, and nothing in the record indicates the jury considered it. Thus, even if it was error to preclude Ms. Greene from presenting evidence of her ownership of the untaken land, it was harmless.

Ms. Greene raises a number of other arguments on appeal either for the first time or only cursorily. We decline to address these arguments. *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 n. 9 (D.C.2001) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (alteration removed) (citation omitted); *District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 33 n. 3 (D.C.2001) ("[A]s this court has reiterated on innumerable occasions, '[q]uestions not properly raised and preserved during the proceedings under examination ... will normally be spurned on appeal.' ") (quoting *D.D. v. M.T.*, 550 A.2d 37, 48 (D.C.1988)) (second alteration in original).

4. Ms. Greene purchased this land directly and through business entities that she controls.

the bottom of the crescent was about a block away from Skyland Shopping Center. Although Ms. Greene maintained that she always intended to develop this land, and although she made some improvements to the property during the decades in which she owned it (*e.g.*, filling and regrading portions of the land), for the duration of her ownership, the land remained wooded, undeveloped, and unused.

Ms. Greene became aware in the early 1990's that the District was interested in revitalizing the Skyland area. In 2004, the District targeted Ms. Greene's land for development in conjunction with a plan to renovate the Skyland Shopping Center. In February 2005, the District offered to purchase approximately seven of Ms. Greene's eight and a half acres of land— the middle and bottom of the crescent-shaped parcel—for $943,000. Ms. Greene declined to sell at that price.

Instead, in June 2005, Ms. Greene asked an architect, Jane Nelson, to create a development plan that would demonstrate her land's market value.[5] Nelson Architects, in coordination with engineers and cost estimators, created a series of plans that attempted to maximize the density of development under existing zoning regulations while accommodating the "severe" topography of the site, which had dramatic changes in elevation. The final plan, which Ms. Greene and Ms. Nelson determined represented the highest and best use of the property, called for the construction of a 400–unit condominium complex in the middle of the crescent-shaped property and a total of twenty-four single-family houses, eleven at the top of the crescent and the remaining thirteen at the bottom of the crescent. The land at the top of the crescent-shaped parcel also gave the condominium complex access to public streets.

Well before this final plan was completed, the District filed suit in July 2005, to take Ms. Greene's property and determine just compensation under D.C.Code § 16–1311 (2001). The District and Ms. Greene each engaged an appraiser who filed expert reports opining as to the fair market value of the taken property. Both experts agreed that the best method of valuation under the circumstances was to look at sales of comparable properties in the area, contemporaneous to the taking. Nonetheless, in the almost six years it took to take this case to trial, the nature and scope of the expert testimony was vigorously litigated in multiple motions in limine. The disputes concerned (1) the availability of severance damages to the untaken land; (2) whether the sales that the experts relied upon in appraising the taken property were sufficiently comparable; and (3) the admissibility of other valuation methods for the taken land. The trial court[6] issued a series of rulings that precluded evidence of severance damages and ultimately limit-

---

**5.** Ms. Greene acknowledged at her deposition that the plan was drafted solely for use in the takings litigation:

> Q: So when you hired Nelson Architects, it was not with any understanding that you were actually going to build whatever they came up with; is that correct?
> A: You took the property, I couldn't build anything. I had to come up with a feasible plan of the property. . . .
> Q: Right, they were retained only for the purposes of this litigation then?
> A: Yes.

**6.** Multiple Superior Court judges were assigned to this case because of the length of time between its commencement and trial. We identify the judges who rendered rulings reviewed in this opinion: Judge Retchin precluded evidence of severance damages; Judge Richter made the initial ruling excluding all comparable sales relied upon by Ms. Greene's expert appraiser; and Judge Iscoe made the ultimate rulings regarding the scope of Ms. Greene's expert appraiser's testimony and presided at trial.

ed Ms. Greene's expert's testimony about the basis of his appraisal to four completed comparable sales in the District.

The case finally went to trial in May 2011. At trial, the District's expert appraiser, David Lennhoff, opined that the value of Ms. Greene's taken land amounted to $1,850,000; Ms. Greene's expert appraiser, Dennis Duffy, asserted that the value was $9,561,000. The jury adopted the value offered by Mr. Lennhoff, and the trial judge entered a judgment in the amount of the jury's verdict. This appeal followed.

## II. ANALYSIS

Ms. Greene challenges the adequacy of her compensation in this case on two grounds. First, she asserts that she was improperly precluded from presenting evidence to the jury about severance damages. Whether and under what circumstances a trial court has the power to bar a land owner's presentation of evidence about severance damages are questions of law that we review *de novo*. *Anderson v. Abidoye*, 824 A.2d 42, 44 (D.C.2003). Second, Ms. Greene asserts that her expert appraiser's testimony about the basis for his valuation of the taken property was improperly constricted by the trial court because her appraiser was precluded from testifying about other land sales comparable to the taken land and about valuation methods for the taken land other than comparable sales. We review the trial court's rulings about the scope of an expert's testimony for abuse of discretion. *See Duk Hea Oh*, 7 A.3d at 1009–11 & n. 21.

### A. The Trial Court Properly Precluded Ms. Greene from Presenting Evidence of Severance Damages

We hold that the trial court had a proper gatekeeping role to play vis-à-vis Ms. Greene's claim for severance damages. We further hold that, applying the correct legal standard—whether there was reasonably foreseeable "unity of use" between Ms. Greene's untaken one-and-half-acre parcel of land and her taken seven-acre parcel of land—Ms. Greene did not have a claim for severance damages. Our analysis is driven by the facts specific to her claim; we turn to those facts now.

### 1. The Litigation of Ms. Greene's Entitlement to Severance Damages in Superior Court

Prior to trial, Mr. Duffy, Ms. Greene's expert appraiser, prepared a report in which he concluded that the District should give Ms. Greene almost ten million dollars as compensation for the taking of her property. As set forth in the report, this figure encompassed both the market value of Ms. Greene's taken seven acres, as well as the diminution in value of the one and a half acres she retained. The asserted value of the taken land and the severance damages were never separated out. Relying on the Nelson concept plan, Mr. Duffy simply arrived at a value for Ms. Greene's total holdings, subtracted a discounted value for the untaken land, and then asserted that Ms. Greene was due the difference.[7]

Mr. Duffy explained in his report that he discounted the value of the untaken land in this calculation to account for a loss of what he asserted were "economies of

---

7. Perhaps because Ms. Greene's severance damages were never separated out but instead were incorporated into the total compensation Mr. Duffy asserted was her due, there is some confusion in the record and the briefs regarding the actual dollar figure at issue. Based on the figures cited in Mr. Duffy report, it appears that Ms. Greene claimed severance damages of just over $100,000.

scale." In the Nelson concept plan, eleven single-family homes were located on the untaken land, near the top of the crescent shape of Ms. Greene's total property. Mr. Duffy opined that eleven single-family lots would be less appealing to a developer than developing the entire property as a whole with the condominium unit and twenty-four single-family houses; thus he reduced the per-lot value of the remaining eleven lots by ten percent.[8] Subsequently, when Mr. Duffy was deposed, he said nothing about economies of scale. He admitted that he had not personally determined whether there was a unity of use— that is, a functional integration—between the taken and untaken land; he had simply taken the Nelson concept plan as a given in assessing the value of Ms. Greene's land. Relying on the Nelson concept plan, Mr. Duffy disclaimed that the taken portion of the property added value to the untaken portion, asserting instead that:

> [w]e viewed the property as two separate categories. We looked at it as multi-family and residential. And to the extent that there are separate uses, they should be considered that way. So I don't know that [the taken land] would add necessarily, value to [the untaken land] as an independent item.

When asked "if you remove [the taken land] . . . you could still develop [the untaken land] by placing these 11 houses on it" as called for by the Nelson concept plan, Mr. Duffy responded affirmatively, "I believe that's correct."

The District filed a motion in limine in which it argued that Ms. Greene could not present evidence of severance damages absent a showing of unity of use. In particular the District argued that Ms. Greene had known about its interest in revitalizing the Skyland area for over a decade, and yet had waited until after the District filed the condemnation action to assess the de-velopment potential of her land. Regarding the Nelson concept plan, the District argued it was too inchoate to establish unity of use because Ms. Greene had failed to perform the necessary soil tests and engineering studies to determine if the Nelson concept plan was physically and economically feasible. The District further argued that, in any case, the plan itself called for a separable use—single-family homes—on the untaken portion of the property. Based on these facts, the District argued that Ms. Greene could not show either present unity of use or reasonably probable unity of use in the near future.

In her opposition to the District's motion in limine, Ms. Greene argued that whether there was the requisite unity of use was a question of fact reserved for the jury. Although she conceded that the land was presently unused, she asserted that she should be able to present evidence at trial that she had purchased the land "to create an assemblage of property for future development," and that, to that end, she had hired an architect, Ms. Nelson, to create a development plan for her eight and a half acres. Ms. Greene nowhere argued that the taken land added market value to the untaken land. In particular, she did not argue that the taking disrupted economies of scale, as her expert had asserted in his report.

The trial court ruled for the District and precluded evidence of severance damages at trial. It determined that "the case law is clear that a plan to have an integrated use of the property in the future is not sufficient"; rather, "unity of use at the time of the taking" is "a prerequisite for severance damages." The trial court concluded that "as a matter of law, no reasonable person could conclude that there was unity of use" between the taken and untak-

---

8. Mr. Duffy did not explain how he arrived at this precise percentage.

en land in this case. On appeal, Ms. Greene renews her argument that her claim for severance damages should have gone to the jury.

### 2. Basic Principles Regarding Just Compensation and Severance Damages

This court has never examined whether a trial court may screen claims for severance damages, or, if so, what criteria it should use. The District's condemnation statute provides no guidance. It provides generally that the jury shall "hear and receive any evidence offered or submitted on behalf of the District of Columbia and by any person having an interest in the proceeding," D.C.Code § 16–1317 (2001), but it says nothing about consideration of severance damages and provides only that the jury "shall take into consideration, when a part only is taken, the benefit to the remainder of the tract, and shall give their appraisement accordingly." *Id.*

 As a preliminary matter, we note that the statute's silence does not preclude a claim for severance damages under our condemnation statute (and the District has not argued that it does). The right to "just compensation" when the government takes private property for public use is founded in the Fifth Amendment to the United States Constitution. As the Supreme Court has explained, the procedure by which compensation is determined is left to the government conducting the taking,[9] but that entity cannot legislate that anything less than "just compensation"— *i.e.,* "the loss caused to [the landowner] by the appropriation"—be awarded.[10] More-

over, when the government makes only a partial taking, "just compensation" requires consideration of any decrease or increase in market value to the land that is untaken:

> When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account. When, on the other hand, the part which he retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened.

*Bauman,* 167 U.S. at 574, 17 S.Ct. 966; *see also Aaronson v. United States,* 79 F.2d 139, 140 (D.C.Cir.1935) ("It is ... of no consequence whether a provision be inserted in the condemnation act requiring the jury to take into consideration either damages on the one hand, or benefits on the other, for in either case they will be competent to do this ... since both [benefits and damages] are elements inherent in the determination of ... just compensation."). In short, a landowner "is entitled to receive the value of" no more or less than "what [s]he has been deprived of." *Bauman,* 167 U.S. at 574, 17 S.Ct. 966.

### 3. The Role of the Trial Court

 Given the availability of severance damages in the appropriate case, the question is whether the trial court may serve as gatekeeper regarding such claims and, if so, when. As the discussion above indicates, when severance damages to untaken land are sought, a threshold question must

---

**9.** *Bauman v. Ross,* 167 U.S. 548, 569, 17 S.Ct. 966, 42 L.Ed. 270 (1897) ("[T]he constitution only provides for the general principle. The means of ascertaining the just compensation were left to be decided by the public authority....") (quoting *Chesapeake & Ohio Canal Co. v. Key,* 5 F.Cas. 563, 564 (C.C.D.C.1829) (No. 2, 649, 3)).

**10.** *Id.* at 574, 17 S.Ct. 966 (The right of eminent domain "cannot be exercised except upon condition that just compensation shall be made to the owner; and it is the duty of the state, in the conduct of the inquest by which the compensation is ascertained, to see that it is just....").

be considered, namely, "whether the part taken is itself a separate economic unit, or whether it is only a part of the separate economic unit (*i.e.*, part of a larger parcel)." Julius L. Sackman, 4A *Nichols on Eminent Domain* § 14.02[2][a][i] (3d ed.2012) [hereinafter *Nichols*];[11] *see also Sharp v. United States,* 191 U.S. 341, 354, 24 S.Ct. 114, 48 L.Ed. 211 (1903) (whether a landowner is entitled to severance damages requires a showing that the taken land is "reasonably or substantially necessary to the enjoyment of [the untaken property]"). In determining whether such integration is present, courts look to a "variety of factors" but they "[t]ypically ... require three elements: Unity of use, unity of ownership, and contiguity. Jurisdictions vary in the weight they give to these three unities but the modern trend is to give greatest weight to the unity of use," *Nichols* § 14.02[2][a][i], a term of art which refers to some measure of functional integration between the taken and untaken properties that adds market value to the untaken land, *id.* at § 14B.03[4][a]. Here the District and Ms. Greene agree that proof of unity of use is required,[12] although they disagree who should decide whether it exists.

The District argues that ascertaining unity of use and thus the viability of a claim for severance damages is a question of law reserved for the trial court; Ms. Greene argues to the contrary that unity of use is a question of fact that must always go to the jury. We think the answer lies somewhere in between.

We note that both parties conceded at oral argument that unity of use was more properly characterized as a mixed question of law and fact, and rightly so. As the cases discussing this issue illustrate, the presence or absence of unity of use is mired in the particular facts presented. As the Supreme Court noted in *Sharp,* the reality is that it "is often difficult, when part of a tract is taken, to determine what is a distinct and independent tract," and the "character of the holding and the distinction between the residue of a tract whose integrity is destroyed by the taking, and what are merely other parcels or holdings of the same owner ... must largely depend on the facts of the particular case." 191 U.S. at 354, 24 S.Ct. 114.

For this reason, *Nichols* informs us that "the rule in most states is that the issue of unity [of use] ... is necessarily a question of fact for the jury or designated trier of fact, unless reasonable minds could not differ on the issue." *Nichols* § 14B.04[1]; *see also Sharp,* 191 U.S. at 352–54, 24 S.Ct. 114 (noting that, had there been a factual dispute about the relationship of the three parcels of land at issue, "it would be proper to leave that question to the jury," but holding that the trial court properly precluded evidence of severance damages where, based on undisputed facts, landowner was not entitled to them as a matter of law); *Nichols* § 14B.04[1] ("Although there may be circumstances in which the question of unity is a question of law, when unity hinges on disputed facts, it is almost uniformly appropriate to submit the question to the jury."). We adopt this rule for the District of Columbia.

In so doing, we acknowledge, as does *Nichols, id.* § 14B.04[1], that there is some contrary federal authority holding that unity of use should always be deter-

---

11. *Nichols* is recognized as a "leading authority" on the law of eminent domain. *Washington Metro. Area Transit Auth. v. One Parcel of Land in Montgomery Cnty., Md.,* 691 F.2d 702, 705 n. 2 (4th Cir.1982). Both parties cited to *Nichols* in their briefs.

12. There was no dispute that Ms. Greene owned the entire property and that her land holdings were contiguous.

mined by the trial court. The District cites to *United States v. 105.40 Acres of Land*, 471 F.2d 207 (7th Cir.1972). But in reaching its decision, the Seventh Circuit relied on a non-severance-damages Supreme Court case, *United States v. Reynolds*, 397 U.S. 14, 20, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970), interpreting the force of Federal Rule of Civil Procedure 71.1(h).[13] *105.40 Acres*, 471 F.2d at 212. Rule 71.1(h) directs that the trial court in eminent domain cases decide "all issues, including compensation," except when there is a jury demand for determination of compensation or a specific statute delegating that task to a specially constituted tribunal. The District of Columbia rules contain no corresponding provision. D.C. Superior Court Rule of Civil Procedure 71A (h) simply directs that the "[t]he trial shall be conducted pursuant to the applicable statutes." D.C.Code § 16–1317 provides in turn that the jury shall "hear and receive any evidence offered or submitted on behalf of the District of Columbia and by any person having an interest in the proceeding . . . [and] shall return to the court, in writing, their appraisement of the value of the interests of all persons, respectively, in the real property. . . ."[14]

Having determined that the issue of severance damages should ordinarily go to a jury and that a trial court may intervene only when reasonable minds cannot differ regarding unity of use, the question becomes whether this was a case where the trial court could rule that severance damages to Ms. Greene's untaken land were unavailable as a matter of law. We hold that it was, although for different reasons than the trial court articulated. *See District of Columbia v. Acme Reporting Co.*, 530 A.2d 708, 712 (D.C.1987) ("As always, we are free to sustain the trial court judgments on grounds different from those on which the trial court relied.").

### 4. The Requirement of Reasonably Foreseeable Use

■ The trial court ruled that severance damages were unavailable as a matter of law because there was no actual, present use of the untaken and taken land. Ms. Greene asserts that the correct standard for unity of use is whether integrated use of untaken and taken parcels is reasonably foreseeable. We agree. Of the circuits that have confronted the issue (the First, Third, Fourth, Sixth, and Ninth), it appears that the greater number endorse reasonably foreseeable use.[15] Our survey

---

13. Formerly Fed.R.Civ.P. 71A (h).

14. Ms. Greene argues that allowing the trial court any gatekeeping role vis-à-vis severance damages would conflict with D.C.Code § 16–1317. Ms. Greene's argument proves too much. Certainly section 16–1317 does not mandate the jury's consideration of any and all proffered evidence regardless of its relevance or admissibility.

15. *United States v. 27.93 Acres of Land*, 924 F.2d 506, 515–16 (3d Cir.1991) ("To receive . . . severance damages, the landowner must show that there is a reasonable probability of the lands in question being combined . . .") (internal quotation marks omitted); *One Parcel of Land in Montgomery Cnty.*, 691 F.2d at 704–05 (noting that "the pivotal question [in determining whether the taken and untaken

land are part of the same tract] is whether there is a *potential* unity of use between the taken land and the retained land") (emphasis added); *Baetjer v. United States*, 143 F.2d 391, 395 (1st Cir.1944) (severance damages require assessment of whether the landowner's "holdings by reason of the uses to which they were being put, or would probably be put in the reasonably near future, constituted a single, integrated, unitary tract"). *But see United States v. Certain Land Situated in Detroit*, 450 F.3d 205, 209 (6th Cir.2006) ("The weight of authority . . . is that there must be evidence that such an integrated, unitary use with an adjacent parcel of land must have existed at the time of the taking."); *Cole Inv. Co. v. United States*, 258 F.2d 203, 205 (9th Cir.1958) (noting that unity of use requires "actual and permanent" use).

of state cases likewise reveals that a majority of states that have considered the issue have endorsed a reasonably foreseeable use standard.[16] Indeed, even the case law cited by the trial court endorsed a reasonably foreseeable use standard.[17]

Equally if not more important than persuasive authority from other jurisdictions, a rule broader than actual, present use makes sense within the constitutional framework of just compensation, which is tied to fair market value. Even if unity of use is not present and actual, if it is reasonably foreseeable, it will have an effect on market value now. *Neumann*, 25 Cal. Rptr.2d 480, 863 P.2d at 737 ("[C]ontiguous property held in common ownership but devoted to separate uses may nonetheless be valued *by the market* for an inte-

grated use.... [T]he development potential of the separate parcels considered as a whole add[s] to their collective present value....."); *McKinney*, 222 S.W.3d at 883 (unity of use turns on whether there is current effect on market value); *see also Nichols* § 14B.03[2] (economic value is the "touchstone" of unity analysis). And if reasonably foreseeable integrated use has a present effect on market value then it should be compensable as a component of just compensation under the Takings Clause and the District's condemnation statute. *See Neumann*, 25 Cal.Rptr.2d 480, 863 P.2d at 737 ("When the government impairs that [reasonably foreseeable] integrated use by taking some of the property, the property remaining declines in value, and the owner, under the constitu-

16. *See, e.g., State v. Goodwyn*, 272 Ala. 618, 133 So.2d 375, 378–80 (1961); *City of Phoenix v. Wilson*, 200 Ariz. 2, 21 P.3d 388, 394–95 (2001); *City of San Diego v. Neumann*, 6 Cal.4th 738, 25 Cal.Rptr.2d 480, 863 P.2d 725, 727 (1993); *State ex rel. Comm'r of Dep't of Corr. v. Rittenhouse*, 634 A.2d 338, 343–44 (Del.1993); *Dep't of Transp., Div. of Admin. v. Jirik*, 498 So.2d 1253, 1257 (Fla.1986) (approving of unity of use factors laid out by the Florida District Court of Appeals in *Div. of Admin., Dep't of Transp. v. Jirik*, 471 So.2d 549, 554–55 (Fla.Dist.Ct.App.1985)); *State ex rel. Symms v. City of Mountain Home*, 94 Idaho 528, 493 P.2d 387, 390–91 (1972); *Valley Paper Co. v. Holyoke Hous. Auth.*, 346 Mass. 561, 194 N.E.2d 700, 704–05 (1963); *State Highway Comm'n v. Milanovich*, 142 Mont. 410, 384 P.2d 752, 755–56, 758–59 (1963); *In re Vill. of Port Chester v. Bologna*, 95 A.D.3d 895, 896–97, 943 N.Y.S.2d 575 (N.Y.App.Div.2012); *City of Hazelton v. Daugherty*, 275 N.W.2d 624, 629 (N.D.1979); *Oregon R. & Nav. Co. v. Taffe*, 67 Or. 102, 135 P. 332, 332 (1913); *Hurley v. State*, 82 S.D. 156, 143 N.W.2d 722, 726–27 (1966); *Sanders v. Sullivan Cnty.*, 48 Tenn.App. 531, 348 S.W.2d 909, 912 (1960); *McKinney Indep. Sch. Dist. v. Carlisle Grace, Ltd.*, 222 S.W.3d 878, 882–83 (Tex.App.2007).

17. Two of the four cases to which the trial court cited state that reasonably foreseeable

use is all that is required. *United States v. Mattox*, 375 F.2d 461, 463 (4th Cir.1967) ("[T]here must exist a reasonable probability that the separate tracts would have been combined for such integrated use."); *E. Tenn. Natural Gas Co. v. 2.93 Acres in Wythe Cnty.*, No. 4:02CV00179, 2007 WL 2688414, at *4 (W.D.Va. Sept. 13, 2007) (acknowledging that a landowner might suffer consequential damages "where the landowner has an imminent plan of assemblage with the adjacent property at the time of the taking," but determining that severance damages were not permitted because the landowner had failed to "put forward any evidence showing such a plan in the reasonably near future"). A third case does not address the question of actual versus reasonably foreseeable use and is simply not on point. *United States v. Certain Parcel of Land in Jackson Cnty.*, 322 F.Supp. 841 (W.D.Mo.1971). Only a fourth and final case, from the Ninth Circuit, *Cole*, 258 F.2d 203, holds that actual, present use is required. As noted above, this appears to be a minority position, and even the Ninth Circuit's endorsement of this analysis is in question where it held that severance damages were not available because the land owner had failed to show "at any time that there was a unified use between the two tracts; *and* ... there was no claim that the fair market value of the 20 acres remaining was decreased." *Id.* at 206 (emphasis added).

tional guarantee of just compensation, should be compensated for that injury."); *Nichols* § 14B.03[1] ("If the condemnee can demonstrate that the severing of ... unity causes economic damage in the marketplace to the remaining parcels, damages will be awarded.").

Thus, had Ms. Greene come forward with some evidence that District's taking deprived her of a reasonably foreseeable integrated use of her taken land with her untaken land, thereby diminishing the untaken land's current market value, Ms. Greene would have been entitled to present a claim of severance damages to the jury. But where Ms. Greene utterly failed to proffer any evidence that could support a determination that there was a reasonably foreseeable unity of use between her taken and untaken land, the trial court properly precluded Ms. Greene from presenting her severance damages claim. *See Neumann*, 25 Cal.Rptr.2d 480, 863 P.2d at 733 (severance damages which are "speculative, remote, imaginary, contingent, or merely possible ... cannot serve as a legal basis for recovery") (alteration in original) (quoting *City of Menlo Park v. Artino*, 151 Cal.App.2d 261, 311 P.2d 135, 142 (1957)).

 The relevant facts were not in dispute,[18] and they reveal that an integrated use of Ms. Greene's property was not only *not* reasonably foreseeable, it was never envisioned. Ms. Greene stated that she began purchasing property near the preexisting Skyland Shopping Center in the 1960's with an aim to develop this land. But she acknowledged that all she ever intended was "to create an assemblage of

property [including the untaken and taken land] for future development" or to create such an assemblage to sell to someone else for future development. This alone was insufficient to create a jury question about the impact of the taking on the market value of Ms. Greene's untaken land.

Amassing an assemblage of land for development does not automatically create a whole greater than the sum of its parts, nor does it automatically confer added value on the aggregated parts if and when they are broken back up into individual parcels. Put another way, Ms. Greene could not create unity of use between what would become the taken and untaken land simply by declaring that she intended to develop her property holdings as a single unit or sell her land as one parcel for someone else to develop it.

The valuation of the parcels of land must depend not only on what has been assembled but also what, if any, benefits the taken land confers on the untaken land. Here, there was simply no evidence that the taken land conferred any benefit on the untaken land, or that the untaken land would derive a particular benefit from being developed with the taken land, either at the time of trial or any time in the foreseeable future.[19]

Ms. Greene argues, however, that the Nelson concept plan for her total eight-and-a-half-acre parcel demonstrated a reasonably foreseeable unity of use between the untaken and taken property. This argument fails for multiple reasons. The Nelson concept plan was developed around the time of the taking to establish the

---

18. Ms. Greene argues that there was "at a minimum" a factual dispute about the efforts she had taken to sell her property for development before the District initiated this condemnation action. For the reasons discussed below, we do not deem this a material issue of fact with respect to her claim for severance damages.

19. It may be, in fact, that Ms. Greene's untaken land will actually benefit, not suffer, from the taking because of its proximity to the Skyland project. The District has never made this argument.

highest and best use for the taken property and thereby establish its market value at the time of the taking. It was drafted solely for the purposes of litigation; it was never an actual plan for development, as Ms. Greene conceded in her deposition testimony. See note 5, *supra.* Moreover, this hypothetical plan—and the expert testimony valuing Ms. Greene's land based on this hypothetical plan—did not establish a reasonably foreseeable unity of use any more than Ms. Greene's long-held objective to develop her land as an assemblage.

Indeed, even pursuant to the Nelson concept plan, the development of the untaken parcel, located at the top of the crescent shape of Ms. Greene's total holdings, was entirely severable.[20] The Nelson concept plan envisioned building eleven single-family homes on that parcel, and a condominium complex and thirteen single-family homes on the taken land. Mr. Duffy conceded at his deposition that the untaken parcel neither needed the taken parcel nor somehow derived additional value therefrom. Mr. Duffy's fleeting assertion in his expert report about economies of scale was never relied upon by Ms. Greene as a basis for unity of use either in the trial court or on appeal[21] and in any event makes no sense. The Nelson concept plan itself separated the eleven single-family

homes placed on the untaken land from the thirteen single-family homes on the taken land by placing a 400–unit condominium in between.[22]

Nevertheless, Ms. Greene argues that, because the untaken land gave public road access to the taken land, "there was mutual dependence between" the two parcels. This dependence was not mutual. It ran only in one direction: the taken land, without access, was dependent on the untaken land; the untaken land, with access, was not.[23] Indeed, had the District taken the parcel with access and left Ms. Greene with the parcel without, Ms. Greene may well have had a viable severance damages claim.

In sum, we conclude that, although reasonably foreseeable future uses should be taken into account when determining unity of use, no reasonable juror could have found a unity of use on these facts where the only proffer Ms. Greene made to the trial court was that she intended "to put together the assemblage of property she [had] acquired in the Skyland area" and "develop it herself, or sell it to a developer as a unit." Accordingly the trial court did not err in determining that Ms. Greene had no claim to severance damages as a matter of law.

**20.** Accordingly, we need not address the District's argument that there were reasons to doubt the feasibility and marketability of developing Ms. Greene's property pursuant to the Nelson concept plan.

**21.** See D.D., 550 A.2d at 48 (" 'Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal.' ") (quoting *Miller v. Avirom,* 384 F.2d 319, 322 (D.C.Cir.1967)).

**22.** To the extent Mr. Duffy's concept of economies of scale pertained to the simultaneous,

mixed-used development of the property, the term loses all coherence.

**23.** We reject any argument by Ms. Greene that the untaken land had more value to her because it provided the taken land with public road access. Market value is an objective measure, and the special use to Ms. Greene of any of her property is not properly considered. *See United States v. Petty Motor Co.,* 327 U.S. 372, 377, 66 S.Ct. 596, 90 L.Ed. 729 (1946) ("[J]ust compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.' ").

## B. The Trial Court Properly Limited the Testimony of Ms. Greene's Expert Regarding His Foundation for the Valuation of the Taken Land

Ms. Greene argues that she was inadequately compensated for her taken land because overly restrictive rulings by the trial court limited her expert's testimony regarding his valuation of these seven acres. Specifically, she asserts that the trial court abused its discretion when it barred her expert, Mr. Duffy, from discussing one comparable sale not included in his initial expert report. She also asserts that the trial court abused its discretion when it barred her expert from testifying about alternative methods of calculating the value of the taken land, even though her expert conceded that comparable sales was the best method of valuation under the circumstances.

We see no abuse of discretion in the trial court's ruling barring the expert from testifying about one additional comparable sale not included in his initial report. The court's ruling must be considered in context.

From the outset, Mr. Lennhoff, the District's expert appraiser, and Mr. Duffy, Ms. Greene's expert, agreed that the appropriate method for valuing Ms. Greene's land was by reference to comparable sales. The hotly litigated question pretrial was which sales were sufficiently comparable such that they could form a foundation for the experts' opinions regarding the value of Ms. Greene's taken land. At one point, all seven of Mr. Duffy's comparable sales were deemed inadmissible, either because they were not, in fact, consummated sales or because the trial court deemed them too dissimilar to the taken property. Long after the deadline for the submission of expert reports had passed and shortly before a scheduled trial date, however, Ms. Greene filed a 155-page supplemental report from Mr. Duffy discussing an additional comparable sale not mentioned in his previous reports. The government moved to strike this supplemental report, noting, *inter alia*, that this was the third major revision of Mr. Duffy's report and that, as a result of these revisions, the trial date had already been pushed back by a year.[24] Ms. Greene responded by moving for relief under D.C. Superior Court Rule 60 of Civil Procedure from the trial court's earlier ruling precluding Mr. Duffy from testifying about any of the comparable sales previously listed in his report; in her motion, Ms. Greene asserted that the new comparable sale constituted newly discovered evidence on which Mr. Duffy should be permitted to rely.

 This round of pleadings ended in victory for Ms. Greene. She persuaded the trial court to permit Mr. Duffy to rely on four comparables that had previously been excluded. To be sure, the trial court declined to permit Mr. Duffy to testify about the newly documented comparable sale, but it did so because it determined that this comparable could have been discovered through due diligence prior to the issuance of Mr. Duffy's initial report.[25] Given that this sale had been verified two

---

24. Also as a consequence of these revisions, the District had already deposed Mr. Duffy three times.

25. In her reply brief, Ms. Greene argues for the first time that the trial court failed to employ the five-factor analysis set forth in *Weiner v. Kneller*, 557 A.2d 1306, 1311–12 (D.C.1989), to determine when an expert may testify about matters not included in a Rule 26(b)(4) statement. Because Ms. Greene did not raise this argument in the trial court (rather, as noted, she litigated her motion under Rule 60(b), not Rule 26, or in her initial brief to this court, we do not address it). *Helen Dwight Reid Educ. Found.*, 766 A.2d at 33 n. 3; *Stockard v. Moss*, 706 A.2d 561, 566 (D.C.1997).

years earlier by the District's expert, and given Mr. Duffy's admission that he had been aware of this comparable when he filed his initial report but had not included it because he had failed to verify it, we deem this a sound ruling.[26] Moreover, even if we were to deem this ruling error, we see no harm in the exclusion of the supplemental report because this comparable did not alter Mr. Duffy's ultimate opinion.

■ We likewise see no abuse of discretion in the trial court's ruling precluding Mr. Duffy from founding his valuation of Ms. Greene's property on methods other than comparable completed sales. Ms. Greene argues that her expert should have been permitted to rely on one offer to buy and two unconsummated contracts to calculate the value of her land. But these not-yet-sales provided a much weaker indication of how the market might value the properties in question, and thus Ms. Greene's property; thus, the trial court did not abuse its discretion in excluding them. Ms. Greene also argues that her expert should have been able to testify about (1) his supposition regarding the amount a hypothetical buyer would pay for Ms. Greene's land if already developed, discounted by construction costs and reasonable profits (the land residual approach); (2) his examination of sales of land with buildings on them targeted for rental or condo conversion (shell sales); and (3) his examination of land sales outside of the D.C. area (macro sales). But Mr. Duffy admitted that these analyses are either not "stand-alone," "primary" techniques of determining fair market value, or not methods of valuation at all, and that they simply served as "additional background" to his comparable sales analysis. As documented in his report, they did not alter his opinion of the value of Ms. Greene's property. Therefore the trial court's exclusion of such techniques cannot constitute an abuse of discretion.

We conclude that the trial court did not abuse its discretion in its effort either to preclude further pretrial delays by barring supplementation of Mr. Duffy's already thrice-revised report, or to streamline the evidentiary presentation in this case which, notwithstanding these efforts, lasted eight days. Ms. Greene was given a full and fair opportunity to present evidence to the jury regarding the value of her taken property, and the jury's rejection of Mr. Duffy's almost ten million dollar price tag for her land cannot be attributed to any procedural deficiency at her trial.

The judgment of the Superior Court is hereby

*Affirmed.*

---

26. Ms. Greene calls foul because the trial court permitted the District's appraiser, Mr. Lennhoff, to supplement his report shortly before trial while denying Mr. Duffy the same opportunity. The two supplements were simply not equivalent. Mr. Lennhoff's supplement consisted of a three-page letter detailing certain inaccuracies of the verification of a comparable sale that was already contained in Mr. Lennhoff's report. It was the only correction Mr. Lennhoff issued. It was also disclosed promptly upon discovery, and Ms. Greene was able to depose Mr. Lennhoff regarding the correction prior to trial. By contrast, Mr. Duffy's supplement, as noted above, consisted of 155 pages and proposed adding an entirely new comparable to his analysis. The contrasting rulings were not evidence of disparate treatment—just disparate circumstances.